## ORAL ARGUMENT HAS NOT BEEN SCHEDULED

**Case No. 11-1284 (Consolidated with 11-1348)**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **AMPERSAND PUBLISHING, LLC** | ) |
| **D/B/A SANTA BARBARA NEWS-PRESS** | ) |
| *Petitioner* | ) |
| **v.** | ) |
| | ) |
| **NATIONAL LABOR RELATIONS** | ) |
| **BOARD,** | ) |
| *Respondent* | ) |
| and | ) |
| | ) |
| **GRAPHICS COMMUNICATIONS** | ) |
| **CONFERENCE OF THE INTERNATIONAL** | ) |
| **BROTHERHOOD OF TEAMSTERS** | ) |
| *Intervenor* | ) |

**Petition for Review and Cross-Petition for Enforcement of a Decision and Order of the National Labor Relations Board**

**OPENING BRIEF OF AMPERSAND PUBLISHING, LLC**
**D/B/A *SANTA BARBARA NEWS-PRESS***

L. Michael Zinser
Glenn E. Plosa
**THE ZINSER LAW FIRM, P.C.**
414 Union Street, Suite 1200
Nashville, Tennessee 37219
Telephone:   615.244.9700
Facsimile:   615.244.9734

Attorneys for Ampersand Publishing, LLC

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

The Petitioner, Ampersand Publishing, LLC, d/b/a *Santa Barbara News-Press* ("SBNP"), in accordance with Circuit Rule 28(a)(1) certifies that SBNP filed its Petition for Review on August 11, 2011, this case was docketed on August 12, 2011, and catalogued as 11-1284.

On August 18, 2011, Graphics Communications Conference of the International Brotherhood of Teamsters ("the Union") filed a Petition for Review catalogued as 11-1300. The court issued an Order on its own motion dated August 31, 2011, consolidating these two cases. On September 15, 2011, *Santa Barbara News-Press* filed a Motion to Intervene in Case No. 11-1300.

On August 18, 2011 the Union also filed a Motion to Intervene in case 11-1284. On October 4, 2011, the court granted the Union's motion.

On September 26, 2011, the NLRB filed a Cross-Petition for Review that the court docketed and catalogued as 11-1348. The court consolidated this case with SBNP's Petition for Review.

On October 14, 2011, the Union moved to withdraw its Petition for Review. The court granted the Union's motion on October 17, 2011.

*Santa Barbara News-Press* further certifies:

i

A.    PARTIES, INTERVENORS, AND *AMICI CURIAE*

BEFORE THIS COURT

1.    Ampersand Publishing, LLC, d/b/a *Santa Barbara News-Press* (Petitioner in Case No. 11-1284 and Respondent in Case No. 11-1348)

L. Michael Zinser, Esq.
Glenn E. Plosa, Esq.
THE ZINSER LAW FIRM, P.C.
414 Union Street, Suite 1200
Nashville, TN 37219

2.    National Labor Relations Board (Respondent in 11-1284 and Petitioner in 11-1348)

Linda Dreeben, Esq., Deputy Associate General Counsel
Julie Broido, Esq.
Kira Vol, Esq.
National Labor Relations Board
1099 14th Street, N.W.
Washington, DC 20570-0001

3.    Graphics Communications Conference of the International Brotherhood of Teamsters (Intervenor in Case 11-1284)

Ira L. Gottlieb, Esq.
Bush Gottlieb Singer Lopez
   Kohanski Adelstein & Dickinson
500 North Central Avenue, Suite 800
Glendale, CA 91203

BEFORE THE NATIONAL LABOR RELATIONS BOARD

1.    Ampersand Publishing, LLC, d/b/a *Santa Barbara News-Press*
      (Charged Party)

      L. Michael Zinser, Esq.
      THE ZINSER LAW FIRM, P.C.
      414 Union Street, Suite 1200
      Nashville, TN 37219

      A. Barry Cappello, Esq.
      Troy A. Thielemann, Esq.
      Matthew M. Clarke, Esq.
      Dugan P. Kelley, Esq.
      CAPPELLO & NOEL LLP
      831 State Street
      Santa Barbara, CA 93101

      Carter G. Philips, Esq.
      Paul J. Zidlicky, Esq.
      SIDLEY AUSTIN LLP
      1501 K Street, N.W.
      Washington, DC 20005

2.    National Labor Relations Board (Agency)

      Steven Wyllie, Esq.
      Brian D. Gee, Esq.
      National Labor Relations Board, Region 31
      11150 W. Olympic Blvd., Suite 700
      Los Angeles, CA 90064

3.    Graphics Communications Conference of the International
      Brotherhood of Teamsters (Charging Party)

      Ira L. Gottlieb, Esq.
      Bush Gottlieb Singer Lopez Kohanski Adelstein & Dickinson
      500 North Central Avenue, Suite 800
      Glendale, CA 91203

Robert Guiliano
1072 Casitas Pass Road, #274
Carpinteria, CA 93013

**B.    RULINGS UNDER REVIEW**

The ruling under review is the August 11, 2011 Decision and Order of

NLRB Case No. 31-CA-27950 et. al that mostly affirmed the December 27, 2007

Recommended Decision and Order of an Administrative Law Judge.  The NLRB's

Decision and Order is reported at 357 NLRB No. 51 (August 11, 2011).

**C.    RELATED CASES**

*Santa Barbara News-Press* is not aware of any related cases pending before

this court or any other court regarding the NLRB's Decision in this matter or a

related matter.  This case has not previously been before this court or any other

court.

## CORPORATE DISCLOSURE STATEMENT

The Petitioner, Ampersand Publishing, LLC, d/b/a *Santa Barbara News-Press*, pursuant to Federal Rule of Appellate Procedure (FRAP) 26.1 and Circuit Rule 26.1, states that it is a privately-held California limited liability corporation and it neither has a parent corporation nor a publicly traded company that owns 10 percent or more of its stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...I

CORPORATE DISCLOSURE STATEMENT.............................................VI

TABLE OF CONTENTS ....................................................................... VII

TABLE OF AUTHORITIES ................................................................XIII

GLOSSARY OF ABBREVIATIONS ...................................................XVIII

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF ISSUES........................................................................ 2

    I.    WHETHER THE NLRB'S DECISION AND ORDER WAS
        BASED ON SUBSTANTIAL EVIDENCE IN THE RECORD,
        WHEN TAKEN AS A WHOLE? ........................................... 2

        A.  LEGAL ERRORS RELATED TO PURPORTED NLRA
            SECTION 8(A)(1) VIOLATIONS.................................2

        B.  LEGAL ERRORS RELATED TO PURPORTED NLRA
            SECTIONS 8(A)(1) AND (3) ALLEGATIONS. ................2

        C.  SBNP DEFENSES. .....................................................3

        D.  FACTUAL ERRORS. ..................................................4

        E.  LEGAL ERRORS. ......................................................5

STATUTES AND REGULATIONS ............................................................ 9

STATEMENT OF THE FACTS ............................................................... 13

    II.    BACKGROUND ................................................................ 13

        A.  WENDY MCCAW HAS OWNED AND CONTROLLED SBNP
            SINCE 2000. ......................................................... 13

        B.  MCCAW ENDEAVORS TO REMOVE BIAS. ................... 13

        C.  HISTORICAL DOCUMENTED INSTANCES OF BIAS. ....... 14

            1.  Performance Reviews. ..................................... 14

        2.   *Articles.* ............................................................ *14*

        3.   *The MORI Study.* ............................................. *15*

III.   MCCAW CONTROLS NEWSPAPER CONTENT ..................... 16

    A.   TRAVIS ARMSTRONG'S DUI SENTENCING STORY IS KILLED. ............................................................ 16

    B.   IN MAY 2006 THE PUBLISHERS AGAIN TELL ROBERTS THAT THEIR EXPECTATIONS ARE NOT BEING MET. 17

    C.   MCCAW ISSUES WRITTEN REPRIMANDS FOR PUBLISHING ACTOR ROB LOWE'S ADDRESS. ........... 17

    D.   IN JULY 2006 ROBERTS AND OTHERS RESIGN. ......... 19

IV.   A MUTINY IN FULL SWING. ....................................... 19

    A.   EMPLOYEES DEMAND CONTROL OVER THE CONTENT OF THE NEWSPAPER. ............................................ 19

    B.   SBNP RESPONDS AND EXPLAINS ITS LAWFUL RIGHT TO DIRECT EDITORIAL CONTENT. .............................. 20

    C.   EMPLOYEES RETALIATE AND URGE READERS TO CANCEL THEIR SUBSCRIPTIONS. ........................... 21

    D.   THE UNION MAKES CLEAR THAT ITS GOAL IS CONTENT CONTROL. ....................................................... 22

    E.   SBNP HIRES SCOTT STEEPLETON TO MANAGE THE NEWSROOM. ..................................................... 23

    F.   EMPLOYEES ENGAGE IN UNPROTECTED INTIMIDATION TACTICS. ......................................................... 24

    G.   INSULTING BUTTONS AND SIGNS APPEAR. ................. 25

V.   SBNP CONTINUES ITS GOAL OF ELIMINATING BIAS. ...... 26

    A.   SBNP ELIMINATES ALL NON-SPORTS-RELATED COLUMNS. ....................................................... 26

    B.   SBNP TERMINATES BURNS FOR BIASED REPORTING.. 27

VI.   SBNP INVESTIGATES A BREACH OF ITS
      CONFIDENTIALITY POLICY. ..................................................... 28

VII.  IN JANUARY 2007, SBNP EMPLOYED AN UN-INFLATED
      EVALUATION POLICY. .................................................................. 28

      A.   DAVISON RECEIVES A LOWER SCORE FOR BIAS AND
           ATTEMPTED EXTORTION. ...................................... 29

      B.   HOBBS' PERFORMANCE EVALUATION REFLECTED HER
           BIAS AND USE OF PROFANITY. ............................... 29

      C.   HUGHES' 2006 PERFORMANCE EVALUATION
           CONSIDERED HER FAILURE TO INCREASE
           PRODUCTIVITY. ..................................................... 30

      D.   EVANS MISSED WORK AND MADE FALSE STATEMENTS
           ABOUT SBNP. ........................................................ 30

VIII. SBNP TERMINATES DAVISON FOR BIASED REPORTING. 30

IX.   SBNP TERMINATES SUPERVISOR GUILIANO FOR POOR
      PERFORMANCE AND INSUBORDINATION. ........................... 31

X.    SIX EMPLOYEES ATTACK THE PRODUCT TO FURTHER
      THE GOAL OF CONTROLING NEWSPAPER CONTENT .... 32

XI.   SBNP OBSERVES A DISRUPTIVE RALLY ADJACENT TO
      THE BUILDING. ............................................................................. 34

XII.  THE UNION CONDUCTS A PUBLIC MEETING AT THE
      SANTA BARBARA PUBLIC LIBRARY. ...................................... 34

XIII. SUBSEQUENT TO DISCHARGE, FORMER EMPLOYEES
      ASSAIL SBNP WITH VITUPERATIVE AND DEFAMATORY
      ATTACKS. ........................................................................................ 36

      A.   BURNS ................................................................... 36

      B.   JULY 14, 2007 LETTER ........................................... 36

SUMMARY OF ARGUMENT .......................................................... 37

XIV.  SBNP'S FIRST AMENDMENT RIGHTS COMPEL GRANTING
      THIS PETITION FOR REVIEW ................................................... 37

**XV.   SECTION 8(A)(1) ALLEGATIONS** ............................................... 37

    **A.   EMPLOYEE INTERVIEWS** ............................................ 37

    **B.   AN OPEN AND NOTORIOUS PUBLIC RALLY CANNOT BE THE BASIS OF SURVEILLANCE** ............................... 38

    **C.   THE PUBLIC LIBRARY MEETING** ............................ 38

    **D.   INSULTING SIGNS ARE UNPROTECTED** ...................... 38

    **E.   THE NEWSROOM MARCH** .................................... 39

**XVI. SECTION 8(A)(3) ALLEGATIONS** ................................................ 39

    **A.   CANCELLING ROSHELL'S COLUMN** .......................... 39

    **B.   BURNS' DISCHARGE** ...................................... 39

    **C.   DAVISON'S DISCHARGE** .................................. 39

    **D.   PERFORMANCE EVALUATIONS AND BONUSES** ............. 40

    **E.   THE FREEWAY SIX** ...................................... 40

**XVII.    PUNITIVE, INSTEAD OF REMEDIAL RELIEF** ............. 40

**STANDING** ............................................................................... 42

**ARGUMENT** ............................................................................. 43

**XVIII.    STANDARD OF REVIEW** ...................................... 43

**XIX. THE NLRA DOES NOT PROTECT EMPLOYEE AND UNION ATTEMPTS TO WREST EDITORIAL CONTROL FROM A NEWSPAPER PUBLISHER** ............................................ 44

**XX.  THE NLRB DISREGARDED JUDICIAL PRECEDENT IN THIS CASE** ....................................................... 45

**XXI. THE NLRB DISREGARDED JUDICIAL TEACHINGS ON SBNP'S FIRST AMENDMENT RIGHTS** ..................................... 48

**XXII.    THE NLRB'S ANALYSIS IMPROPERLY SHIFTED THE BURDEN OF PROOF** ....................................... 50

XXIII.    THE NLRB DECISION CONSTITUTES REGULATION OF SBNP'S RIGHT TO CONTROL THE CONTENT OF THE NEWSPAPER................................................... 51

    A.    SBNP, EXCLUSIVELY, DETERMINES THE NEWSPAPER'S CONTENT ................................................ 51

    B.    THE ORGANIZING EFFORT WAS UNPROTECTED.......... 53

XXIV.    PURPORTED 8(A)(1) VIOLATIONS................................. 55

    A.    STEEPLETON'S EMPLOYEE INTERVIEWS REGARDING THE LEAK OF A CONFIDENTIAL MEMORANDUM DID NOT VIOLATE THE NLRA .................................... 55

    B.    VIEWING A PUBLIC RALLY OUTSIDE THE FACILITY CANNOT VIOLATE THE NLRA ............................. 56

    C.    ATTENDING A PUBLIC MEETING AND EXPRESSING VIEWS TO DEFEND MISREPRESENTATIONS DOES NOT VIOLATE THE NLRA ........................................... 57

    D.    DISPLAYS OF "MCCAW OBEY THE LAW" WERE UNPROTECTED; SBNP LEGITIMATELY DIRECTED EMPLOYEES TO REMOVE BUTTONS AND SIGNS ON CARS IN THE WORKPLACE AND ON COMPANY PROPERTY........................................................... 58

    E.    THE NEWSROOM MARCH WAS UNPROTECTED; SBNP LEGITIMATELY DISCIPLINED EMPLOYEES .............. 60

XXV.    PURPORTED 8(A)(3) ALLEGATIONS. ........................... 61

    A.    SBNP LEGITIMATELY CANCELLED ROSHELL'S COLUMN. ...................................................... 61

    B.    SBNP LEGITIMATELY DISCHARGED BURNS. ............. 62

    C.    SBNP LEGITIMATELY DISCHARGED DAVISON. .......... 64

    D.    PERFORMANCE EVALUATIONS AND BONUSES............. 66

        1.    *Davison*.................................................. 66

        2.    *Hughes.* ................................................. 66

        3.    *Evans.*.................................................... 67

xi

      4.   *Hobbs.* ............................................................ 67

      5.   *Further Error.* ................................................ 68

   E.  **THE FREEWAY SIX.** ..................................... **69**

      1.   *Disloyalty is Unprotected.* ............................ 69

      2.   *The Arbitrary and Capricious Quality of the Decision.* .. 70

      3.   *Illegal Conduct is Unprotected Conduct.* ......... 71

   F.  **UNENFORCED SUBPOENAS** ............................ **72**

**XXVI.**   **THE NLRA DOES NOT PERMIT THE NLRB TO ORDER PUNITIVE REMEDIES.** ............................... **72**

   A.  **INTEREST COMPOUNDED DAILY** .............................. **72**

   B.  **NOTICE READING** ..................................... **73**

   C.  **ELECTRONIC NOTICE POSTING** ............................. **73**

**XXVII.**   **NLRB SHOULD HAVE DISMISSED THE COMPLAINT** ................................................... **74**

**CONCLUSION** ......................................... **75**

**REQUEST FOR ORAL ARGUMENT** .......................... **76**

**CERTIFICATE OF COMPLIANCE** .......................... **77**

**CERTIFICATE OF SERVICE** .............................. **78**

**ADDENDUM** .......................................... **79**

# TABLE OF AUTHORITIES

\* Authorities upon which we chiefly rely are marked with asterisks.

Cases

*Alle-Kiski Med. Ctr.*,
  339 NLRB 361 (2003) ............................................................. 56

*AM Property Holding Corp.*,
  350 NLRB No. 80 (2007) ......................................................... 73

*Am. Golf Corp.*,
  330 NLRB 1238 (2000) ............................................................ 59

*Associated Press v. NLRB*,
  301 U.S. 103, 57 S.Ct. 650, 81 L.Ed.2d 953 (1937) ................................ 48

*B.E.&K. Constr. Co. v. NLRB*,
  536 U.S. 516, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) ........................... 48

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) .............................. 5

*Cable Car Advertisers, Inc.*,
  324 NLRB 732 (1997) .............................................................. 57

*Cooper v. Paychecks, Inc.*,
  960 F.Supp. 966 (E.D.Va. 1997) ................................................... 72

*Detroit News, Inc.*,
  341 NLRB 947 (2004) .............................................................. 60

*Dorey Elec. Co.*,
  312 NLRB 150 (1993) .............................................................. 62

*Ducane Heating*,
  273 NLRB 1389 (1985) ............................................................. 5

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ............................. 44

*Endicott Interconnect Technologies, Inc. v. NLRB*,
  435 F.3d 532 (DC Cir. 2006) .................................................. 60, 69

*F.W. Woolworth Co.*,
  310 NLRB 1197 (1993) ............................................................ 56

*Federal-Mogul Corp. v. NLRB*,
   566 F.2d 1245 (5th Cir. 1978) ................................................................. 63

*Feldcamp Enterprises*,
   323 NLRB 1193 (1997) .......................................................................... 57

*First Legal Support Servs., LLC*,
   342 NLRB 350 (2004) ............................................................................ 73

*Fla. Steel Corp. v. NLRB*,
   587 F.2d 735 (5th Cir. 1979) ................................................................. 63

*George A. Hormel & Co. v. NLRB*,
   962 F.2d 1061 (D.C. Cir. 1992) ............................................................. 69

*Hite v. Vermeer Mfg. Co.*,
   361 F.Supp.2d 935 (S.D.Iowa 2005) ..................................................... 73

Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston,
   515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) ..................... 53

*Hylind v. Xerox Corp.*,
   749 F.Supp.2d 340 (D. Md. 2010) ........................................................ 72

*Int'l Union of Elec., Radio & Mach. Workers v. NLRB.*,
    383 F.2d 230 (D.C. Cir.1967) .............................................................. 73

*Intercity Broadcasting Corp.*,
   281 NLRB 1210 (1986) .......................................................................... 64

*J.J. Cassone Bakery, Inc. v. NLRB*,
   554 F.3d 1041 (D.C. Cir. 2009) ............................................................ 43

*Jackson Hosp. Corp. v. NLRB*,
   647 F.3d 1137 (D.C. Cir. 2011) ............................................................ 44

*Kiro, Inc.*,
   317 NLRB 1325 (1995) .......................................................................... 51

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555,112 S.Ct. 2130, 119 L. Ed. 2d 351 (1992) ..................... 42

*Lutheran's Social Serv. of Minn.*,
   250 NLRB 35 (1981) .............................................................................. 58

*Marshall Engineered Products Co.*,
   351 NLRB 767 (2007) ............................................................................ 5

*McDermott v. Ampersand Publ'g, LLC*,
   2008 WL 8628728 (2010) ............................................................... 46, 47

*McDermott v. Ampersand Publishing, LLC*,
  593 F.3d 950 (9th Cir. 2010) .......................................................... 7, 52, 53

*McKennon v. Nashville Banner Publishing Co.*,
  513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) ............................ 3

*Md. Drydock Co. v. NLRB*,
  183 F.2d 538 (4th Cir. 1950) .................................................... 59

*Mellin-Quincy Mfg. Co., Inc.*,
  53 NLRB 366 (1943) .................................................... 57

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed. 730 (1974) ........... 48, 51, 53, 54, 62

*Midstate Tel. Corp. v. NLRB*,
  706 F.2d 401 (2nd Cir. 1983) .................................................... 59

*Mitchell Manuals, Inc.*,
  280 NLRB 230 (1986) .................................................... 49

*Molon*,
  302 NLRB 138 (1991), enfd. 965 F.2d 523 (7th Cir. 1992) .................... 71

*MTR Sheet Metal, Inc.*,
  337 NLRB 713 (2002) .................................................... 55, 56

*Newspaper Guild of Greater Philadelphia v. NLRB*,
  636 F.2d 550 (D.C. Cir. 1990) .......................................................... 51, 52

*NLRB v. Blue Bell Inc.*,
  219 F.2d 796 (5th Cir. 1955) .................................................... 59

*NLRB v. Catholic Bishop of Chicago*,
  440 U.S. 490, 199 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ........................... 43

*NLRB v. City Disposal Sys., Inc.*,
  465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (2001) ........................... 60

*NLRB v. Fansteel Metallurgical Corp.*,
  306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. (1939) ........................................... 72

*NLRB v. Fed. Pacific Elec. Co.*,
  441 F.2d 765 (5th Cir. 1971) .................................................... 63

*NLRB v. Gissel Packing Co.*,
  395 U.S. 575 (1969) .................................................... 55, 57

*NLRB v. O.A. Fuller Supermarkets Inc.*,
  374 F.2d 197 (5th Cir. 1967) .................................................... 63

*Osco Drug*,
  237 NLRB 231 (1978) ............................................................... 58

*Passaic Daily News v. NLRB*,
  736 F.2d 1543 (D.C. Cir. 1984) ............................................... 61

*Philadelphia Newspapers v. Hepps*,
  475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) ...................... 50, 51

*Republic Aviation Corp. v. NLRB*,
  324 U.S. 793 ..................................................................... 60, 66

*Republic Steel Corp. v. NLRB*,
  311 U.S. 7, 10-12 (1940) ......................................................... 73

*Rossmore House*,
  269 NLRB 1176 (1984), aff'd sub nom. *Hotel Employees & Restaurant Employees Union, Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985) 55, 56

*S&F Mkt. St. Healthcare LLC v. NLRB*,
  570 F.3d 354 (D.C. Cir. 2009) .................................................. 44

*Saint Joseph Hosp. Corp.*,
  260 NLRB 691 (1982) ............................................................. 72

*Scott v. Peterson*,
  2010 WL 3173001 (N.D.Ill. 2010) ............................................. 72

*Sierra Club v. Environmental Protection Agency*,
  292 F.3d 895 (D.C. Cir. 2002) .................................................. 42

*Southern S.S. Co. v. NLRB*,
  316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942) ........................... 72

*Southwestern Bell Tel. Co.*,
  200 NLRB 667 (1972) ............................................................. 59

*Southwestern Broadcasters, Inc.*,
  255 NLRB 330 (1981) ............................................................. 64

*St. James Mercy Hosp., Inc.*,
  307 NLRB 322 (1992) ............................................................. 57

*Teamsters Local 115 v. NLRB*,
  640 F.2d 392 (D.C. Cir. 1981) .................................................. 72

*Univ. of Great Falls v. NLRB*,
  278 F.3d 1335 (D.C. Cir. 2002) ................................................ 43

*WNAC-TV*,
  264 NLRB 216 (1982) ....................................................................... 63, 66

*Wright Line*,
  251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455
  U.S. 989 (1982) ............................................................................... 5, 50

<u>Statutes</u>

29 U.S.C. § 151 ..................................................................................... 1

29 U.S.C. § 157 ................................................................................. 3, 9

29 U.S.C. § 158(a)(1) ............................................................. 2, 9, 11, 55

29 U.S.C. § 158(a)(2) ............................................................................ 11

29 U.S.C. § 158(a)(3) ................................................................... 2, 9, 61

29 U.S.C. § 158(c) ..................................................................... 10, 55, 57

29 U.S.C. § 159(a) ............................................................................... 10

29 U.S.C. § 159(e) ............................................................................... 10

29 U.S.C. § 160(a) ................................................................................. 1

29 U.S.C. § 160(c) ............................................................................... 11

29 U.S.C. § 160(f) ................................................................................. 1

29 U.S.C. §1981 ................................................................................... 72

29 U.S.C. §1983 ................................................................................... 72

## <u>GLOSSARY OF ABBREVIATIONS</u>

| | | |
|---|---|---|
| A | = | Appendix |
| ALJ | = | Administrative Law Judge |
| Armstrong | = | Editorial Page Editor Travis Armstrong (Management) |
| Brantingham | = | Barney Brantingham (employee) |
| Burns | = | Melinda Burns (employee) |
| Cohee | = | Cammie Cohee (employee) |
| Cole | = | Publisher Joe Cole (Management) |
| Davison | = | Anna Davison (employee) |
| Evans | = | Melissa Evans (employee) |
| Foulsham | = | Managing Editor George Foulsham (Management) |
| General Counsel | = | Counsel to the General Counsel |
| Guiliano | = | Editor Robert Guiliano (Management) |
| Gottlieb | = | Union attorney Ira Gottlieb |
| Hobbs | = | Don Hobbs (employee) |
| Hughes | = | Karna Hughes (employee) |
| Hulse | = | Metro Editor Jane Hulse (Management) |
| Keegan | = | Union organizer Martin "Marty" Keegan |
| Kuznia | = | Rob Kuznia (employee) |
| McCaw | = | Wendy McCaw, Owner, President, and Publisher of Santa Barbara News-Press |
| McManigal | = | Barney McManigal (employee) |
| Murphy | = | Deputy Managing Editor Don Murphy (Management) |
| NLRA | = | National Labor Relations Act |
| NLRB | = | National Labor Relations Board |
| Roberts | = | Editor and Publisher Jerry Roberts (Management) |
| Roshell | = | Starshine Roshell (employee) |
| SBNP | = | Santa Barbara News-Press |
| Schultz | = | Tom Schultz (employee) |
| Steepleton | = | Editor Scott Steepleton (Management) |
| The Union | = | Graphics Communications Conference of the International Brotherhood of Teamsters |
| Todd | = | Business Editor Michael Todd (Management) |
| Zant | = | John Zant (employee) |

## JURISDICTIONAL STATEMENT

This court has jurisdiction pursuant to 29 U.S.C. § 160(f).  The NLRB had

jurisdiction pursuant to 29 U.S.C. §§ 151 and 160(a).  The NLRB's final Decision

and Order issued on August 11, 2011, and was reported at 357 NLRB No. 51

(2011).

SBNP petitioned for review on August 11, 2011. The NLRB cross-

petitioned for enforcement on September 26, 2011.  Both filings were timely; the

NLRA places no time limits on proceedings to review or enforce NLRB Orders.

## STATEMENT OF ISSUES

I.    WHETHER THE NLRB'S DECISION AND ORDER WAS BASED ON SUBSTANTIAL EVIDENCE IN THE RECORD, WHEN TAKEN AS A WHOLE?

    A.    LEGAL ERRORS RELATED TO PURPORTED NLRA SECTION 8(A)(1) VIOLATIONS.

- Whether SBNP "coercively interrogat[ed] employees concerning union activities; engag[ed] in surveillance of union activities; require[ed] employees to remove buttons and signs reading 'McCaw obey the Law;' and terminate[ed] supervisor Robert Guiliano?"

- Whether SBNP properly disciplined employees for disrupting the workplace during an employee march through the office?

- Whether SBNP lawfully inquired into the leaking of a confidential memo to a blogger?

- Whether SBNP lawfully observed open and notorious public conduct taking place outside the SBNP's front door?

    B.    LEGAL ERRORS RELATED TO PURPORTED NLRA SECTIONS 8(A)(1) AND (3) ALLEGATIONS.

- Whether SBNP legitimately "cancel[ed] Starshine Roshell's column; discharge[ed] Melinda Burns and Anna Davison; and

lower[ed] the evaluation scores of Union supporters Davison, Dawn Hobbs, Melissa Evans, and Karna Hughes?"

- Whether SBNP legitimately discharged Evans, Hobbs, Kuznia, McManigal, Schultz and Zant for unprotected, illegal misconduct on a footbridge?

## C.    SBNP Defenses.

- Whether the NLRB erred in rejecting SBNP's threshold arguments that the newsroom employees' Union organizing campaign was not protected by the NLRA, involved disloyal conduct, and disparaged SBNP's product.

- Whether the NLRB erred in failing to follow the decisions of the U.S. Supreme Court in *NLRB v. Local 1229 (Jefferson Standard)*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed 195 (1953) and *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995)?

- Whether the NLRB's Decision infringed upon SBNP's First Amendment right to control the content of its newspaper?

- Whether the NLRB erred in finding that "the employees' demands for integrity" were protected by Section 7 of the NLRA?

3

- Whether the NLRB erred by finding that employees' subjective notions of newspaper content "norms" somehow implicated a term of employment, and, in a derivative manner, superseded SBNP's First Amendment rights to control newspaper content?

- Whether the NLRB failed to recognize that adverse employment actions were SBNP's legitimate reaction to protect its editorial discretion?

- Whether the NLRB erred in finding that illegally hanging disloyal signs over a freeway were protected under the NLRA?

- Whether after-acquired evidence justified termination of, and precludes reinstatement of, the alleged discriminatees?

- Whether reinstatement of the discharged employees is bound to affect what gets published?

### D.    FACTUAL ERRORS.

- Whether the NLRB erred in failing to recognize SBNP Exception 79?

- Whether he NLRB erred by claiming it did not address the question of "what was at stake" in the employees' demands, despite repeated findings to the contrary?

### E.   LEGAL ERRORS.

- Whether the burden-shifting analysis of *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), should be modified due to the threshold First Amendment issues?

- Whether the NLRB erred by exploring and analyzing the irrelevant issue of whether collective bargaining proposals about journalistic ethics constitute mandatory subjects of bargaining, as such an inquiry should have been precluded by *Ducane Heating*, 273 NLRB 1389 (1985) and related cases?

- Whether the NLRB erred in finding that the employees' demands to control newspaper content were protected while at the same time finding that pursuing those goals "may relate only to permissive subjects of bargaining"?

- Whether the ALJ and the NLRB properly credited witnesses presented in the hearing pursuant to *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) and *Marshall Engineered Products Co.*, 351 NLRB 767, 768 (2007)?

5

- Whether preclusion or rejection of expert testimony (including Dr. Ralph Haber, Daniel Sullivan, and Paul Cavanaugh) deprived SBNP of due process rights?

- Whether the NLRB erred by not crediting un-rebutted expert testimony by John Irby?

- Whether SBNP was entitled to receive the material requested in the Subpoena Duces Tecum it issued to Sam Tyler, a documentary filmmaker who filmed interviews with current and former members of the news-press staff?

- Whether the NLRB erred by failing to adopt the findings of both the U.S. District Court and the U.S. Court of Appeals for the Ninth Circuit that the organizing campaign was not protected by the NLRA because the employees' and the Union's primary demand was to control the content of SBNP.

- Whether the NLRB erred in finding that its Decision did not pose any risk of interference with the First Amendment rights of SBNP under the circumstances of this case?

- Whether the NLRB Erred in Failing to Dismiss the Complaint?

- Whether the NLRB's Decision and Order Constituted Arbitrary and Capricious Agency Action because it conflicted with

6

established judicial and agency decisions, and because the NLRB

offered no reasoned explanation of why it abandoned established

precedent?

- Whether the NLRB erred by ignoring the U.S. Court of Appeals for

  the Ninth Circuit's findings in *McDermott v. Ampersand Publishing,*

  *LLC*, 593 F.3d 950 (9th Cir. 2010) (petition for rehearing en banc

  denied), and the U.S. District Court for the Central District of

  California's order denying Section 10(j) injunctive relief *McDermott*

  *v. Ampersand Publishing, LLC* (Not reported in F.Supp.2d, 2008

  WL 8628728 (2009)).

- Whether backpay and other monetary awards should be computed

  with interest compounded on a daily basis?

- Whether SBNP should make discriminatees whole by paying them

  what they would have been paid absent discrimination against them,

  with respect to performance bonus payments for 2006?

- Whether SBNP should distribute an electronic notice (such as by e-

  mail, posting on an intranet or internet site, and/or other electronic

  means)?

- Whether SBNP should have the NLRB's notice "publicly read by a

  responsible corporate management official or by a Board agent in

the presence of a responsible management official" as this is an

extraordinary remedy?

## STATUTES AND REGULATIONS

## NATIONAL LABOR RELATIONS ACT

Also cited NLRA or the Act; 29 U.S.C. §§ 151–169

**Sec. 7.  [29 U.S.C. 157.]**  Employees shall have the right to self organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3) [section 158(a)(3) of this title].

**Sec. 8.  [29 U.S.C. 158.]  (a)** [Unfair labor practices by employer] It shall be an unfair labor practice for an employer—

**(1)** to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title];

**(3)** by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this Act [subchapter], or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action

9

defined in section 8(a) of this Act [in this subsection] as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a) [section 159(a) of this title], in the appropriate collective- bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) [section 159(e) of this title] within one year preceding the effective date of such agreement, the NLRB shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

**(c)** [Expression of views without threat of reprisal or force or promise of benefit] The expressing of any views, argument, or opinion, or the dissemination thereof,

whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act [subchapter], if such expression contains no threat of reprisal or force or promise of benefit.

**Sec. 10 [§ 160.] (c)** [Reduction of testimony to writing; findings and orders of Board] The testimony taken by such member, agent, or agency, or the NLRB shall be reduced to writing and filed with the NLRB. Thereafter, in its discretion, the NLRB upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the NLRB shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the NLRB shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of this Act [subchapter]: Provided, That where an order directs reinstatement of an employee, backpay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: And provided further, That in determining whether a complaint shall issue alleging a violation of section 8(a)(1) or section 8(a)(2) [subsection (a)(1) or (a)(2) of section 158 of this title], and in deciding such cases, the same regulations and rules of decision shall

11

apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the NLRB shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the NLRB shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the NLRB shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any backpay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the NLRB, or before an administrative law judge or judges thereof, such member, or such judge or judges, as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the NLRB, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the NLRB may authorize, such recommended order shall become the order of the NLRB and become affective as therein prescribed.

 [The title "administrative law judge" was adopted in 5 U.S.C. § 3105.]

## STATEMENT OF THE FACTS

### II.   BACKGROUND

#### A.   WENDY MCCAW HAS OWNED AND CONTROLLED SBNP SINCE 2000.

In 2000, McCaw acquired SBNP as sole owner and CEO of Ampersand Publishing, LLC. (3428-29 A1129-30).  In April 2006, McCaw assumed the position of Co-Publisher and sits on the Editorial Board, forming the opinions of SBNP. (A991-993, 1131, 1135-36).  As owner of SBNP, McCaw has the undisputed right to control the news and editorial content of the newspaper. (A1134).

#### B.   MCCAW ENDEAVORS TO REMOVE BIAS.

Since 2000, McCaw desired to maintain credibility with SBNP's readers; bias impacts a newspaper's credibility. (A1131).  As owner, CEO, and Publisher, McCaw believes, "For a paper to have credibility, the stories have to be neutral and the reader has to be allowed to make up his or her own mind as to what the story says." *Id*.  In 2000, McCaw expressed her concerns about biased reporting to then-Publisher, Cole. (A1137-38).

In 2002, SBNP hired Roberts as the Executive Editor. (A1139).  McCaw continued to be active in the Editorial section of the newspaper. (A1141).  In 2003, SBNP promoted Roberts to Editor and Publisher, expanding his responsibilities.

(A1139-40).  From 2003 through 2004, however, McCaw saw an increased number of biased stories, contrary to her goal of having an unbiased newspaper. (A1141).  McCaw demoted Roberts from Publisher to Editor in January 2005 so Roberts could focus on removing bias from stories. (A1172).

### C.    HISTORICAL DOCUMENTED INSTANCES OF BIAS.

#### 1.    *Performance Reviews.*

Reporter Burns received warnings of biased articles in her 2000, 2001, 2003, 2004, and 2005 performance reviews. (A1854, 1933, 2003, 1494, 1702).  Reporter Hobbs received a warning for bias in her 2000 performance review.  Reporters Schultz, McManigal, and Davison received reviews critical of biased reporting. (A2409, 1962, 1958).  McCaw expressed concerns about these biased articles to Roberts and Cole. (A1150-55).

#### 2.    *Articles.*

In a July 24, 2004 article, Davison penned a biased story that McCaw – in writing – explained had "no other points of view.  No discussion as to the disadvantages.  She's become like the reporter before her, a mouthpiece. Disgusting." (A1958, 1965).  SBNP expected Davison to write balanced environmental stories. (A1157-61, 1179).

On August 1, 2004, McCaw directed Cole to meet with Roberts and tell Roberts that bias "would no longer be tolerated." *Id.*  Cole met with Roberts, and

Roberts agreed that Davison's writing contained bias. (A2410). Roberts, however, did not correct the problem. (A1171-72).

In April of 2005, Davison wrote a biased story favoring the killing of pigs on the Channel Islands, to which the newspaper wrote a corrective editorial. (A1172-75, 1996, 2000, 2476).

In March 2006, Davison wrote a biased story about otters (A2414, 1188); in April 2006, Davison wrote another biased story about foxes on the Channel Islands. (A2413). McCaw remarked that Davison was a "shill for the Feds" and expressed this to Publisher Cole and Editor Roberts. (A1181-83, 2413).

### 3.    *The MORI Study.*

In 2005, SBNP commissioned Market Opinion Research Institute ("MORI") to assess the opinions of SBNP readers on bias. (A1145). The MORI study determined that 64 percent of SBNP readers believed that SBNP reporters injected bias into news. (A2002).

In an April 8, 2006 Memo, McCaw wrote, to her managers:

"Us" vs. "Them" mentality. This has been a very big problem for far too long not because you haven't heard a lot of my complaints about this, but because you have done nothing to stop it. This will now stop IMMEDIATELY even if it means firing the whole newsroom and hiring new people, including the editors. This has nothing to do with a purported wall between news and editorial, it has everything to do with biting the hand that feeds you.

15

(A2037, 1184-86).  McCaw was fed up with bias in her newspaper, particularly after repeated attempts to correct the problem.  McCaw knew that Burns' and Davison's biases had been tolerated by supervisors; McCaw resolved to make changes. (A2037).

On April 27, 2006, Cole resigned as Publisher. (A1189).  McCaw and Arthur von Wiesenberger became Co-Publishers with a goal of correcting the bias problems. (A1189-90).

## III.   MCCAW CONTROLS NEWSPAPER CONTENT

### A.   Travis Armstrong's DUI Sentencing Story is Killed.

On May 7, 2006, Editorial Page Editor Armstrong was arrested for suspicion of DUI.  Roberts told Armstrong that the news department wanted to do a "small story" on the arrest; Armstrong did not object. (A1048, 1053-54, 1089).  The story was to be a "news in brief." (A1090, 1234)  Instead, Roberts allowed Hobbs to publish a long, detailed story that reflected a personal animus against Armstrong. (A1847, 2348).

Armstrong plead no contest and was sentenced to probation.  Roberts instructed Burns to do a story on his sentencing. (A1047-48).  Armstrong felt that Roberts sensationalized the sentencing story because Roberts disliked Armstrong. (A1048-49).  Armstrong researched how SBNP handled prior DUI sentencing stories, and determined that the newspaper did not run DUI sentencing stories

unless there was a fatality or property damage. (A1050-51).  Armstrong shared this

with the Co-Publishers; the newspaper did not run the sentencing story. (A1051,

1855).  The newsroom disagreed with the Publishers' decision. (A1051-52).

### B.    IN MAY 2006 THE PUBLISHERS AGAIN TELL ROBERTS THAT THEIR EXPECTATIONS ARE NOT BEING MET.

McCaw and von Wiesenberger told Roberts to eliminate the bias and create

a newspaper consistent with their vision. (A1190-92, 1223-24, 2268, 2348).  In

May 2006, the Publishers canceled various newspaper columns, including Roberts'

personal opinion column. (A850-51, 2268, 2348).  Von Wiesenberger also

informed Roberts that Burns' articles were biased and that newspaper readers had

angrily complained about Burns' bias. (A1226, 1229, 1235-36, 2415).

On May 19, 2006, von Wiesenberger again told Roberts to eliminate bias in

the newspaper. (A2268).  Von Wiesenberger pointed out that Davison continued to

write biased stories. *Id*.

### C.    MCCAW ISSUES WRITTEN REPRIMANDS FOR PUBLISHING ACTOR ROB LOWE'S ADDRESS.

On June 21, 2006, Actor Rob Lowe called the newspaper pleading to not

publish his personal home address after a planning commission meeting that day.

(A999-1001).  Lowe feared for the safety of his young children due to prior

stalking incidents. *Id.*  The property address was only associated with his wife's

Berkoff family trust. (A1005-06).

17

Armstrong contacted Editors Foulsham and Hulse about the request. (A1000-01, 1009, 2040).  Both editors and reporter Cohee ignored Armstrong's e-mail and included Lowe's personal address in the story. (A1005, 2041).  The Lowes were extraordinarily upset and cancelled their newspaper subscription. (A1007-08).

On June 23, 2006, McCaw reprimanded Cohee, Foulsham, Hulse, and Editor Todd. (A1440-43).  All objected to the reprimands; Cohee and Todd claimed that the address was appropriate and necessary, though they acknowledged that McCaw could establish a policy for the paper. (A2043, 2047).

McCaw explained:

> You seem to forget that the property was under Sheryl Berkoff's name, not under Sheryl Lowe, not under Rob Lowe ... nowhere in your letter have I seen any concern about the property owners, who are high profile and have small children.  You seem to be giving more importance to the idle curiosity of others.

(A2045).  McCaw further told Foulsham that "one should not have to 'legislate' common sense and good judgment and [McCaw] had not seen a lot of good judgment coming from the newsroom lately." (A2048).  McCaw had begun to change the newsroom from one where reporters believed they "could write what they wanted when they wanted to." (A1010).

### D.    IN JULY 2006 ROBERTS AND OTHERS RESIGN.

McCaw and von Wiesenberger vacationed in July 2006; Armstrong was the Acting Publisher.  (A2049).  On July 5 and 6, Roberts, Foulsham (Managing Editor), Murphy (Deputy Managing Editor), Hulse (Metro Editor), Todd (Business Editor), and Brantingham (Columnist) all resigned. (A1065, 2050, 2051, 2056-57).

Roberts left a scathing resignation letter. (A1057, 2052).  Armstrong decided that Roberts should leave the building so as to avoid any further problems. (A1057-58, 1061-62, 3216-17).  Chaos ensued.  Certain reporters, including Hobbs, yelled "Fuck you, Travis" as Armstrong escorted Roberts from the building. (A1063-64, 2062).

The lines were drawn: reporters in the "Roberts group" wanted, as the NLRB later termed it, "autonomy" without input from the owner; McCaw asserted control over the content of her newspaper.

## IV.   A MUTINY IN FULL SWING.

### A.    EMPLOYEES DEMAND CONTROL OVER THE CONTENT OF THE NEWSPAPER.

Not until July 9, 2006, did several employees contact the Union and sign authorization cards. (A365-70)  On July 11, 2006, approximately 25 newsroom employees drafted a letter demanding that SBNP:

1. "Restore journalism ethics" to the newspaper: "Implement and maintain a clear separation between the opinion/business side of the paper and the newsgathering side;"

2. "Invite back the six newsroom editors who recently resigned;"

3. "Negotiate a contract;" and

4. "Recognize the Union."

(A1595). The goal of the reporters was to keep management from "interfering in the newsroom." (A740-41). Examples of "interference" included instructions to not publish Armstrong's DUI sentencing and to not publish Lowe's address in the newspaper. (A741). Reporters wanted McCaw to "not be involved in news content" (A745, 763), did not want McCaw to direct reporters "what to write," and complained that the newspaper was a "vanity press." (A2840).

## B.  SBNP RESPONDS AND EXPLAINS ITS LAWFUL RIGHT TO DIRECT EDITORIAL CONTENT.

On July 13, 2006, McCaw informed readers that reporters and editors resigned in protest of not being "allowed to flavor the news with their personal opinions." (A2059). Roberts and his supporters had not complied with the owner's clear instructions regarding bias. (A.1199-1200). McCaw personally expressed SBNP's position to employees:

- As the owner of the business, it is common sense that I have the right to have significant input into the content of the product we produce. For anyone to suggest otherwise is just plain wrong.

20

- … the decision of content of the pages of the newspaper is that of management.  Union or no union, that is not going to change.

- Every employer has the right to expect the loyalty of its employees.  All employees owe a duty of loyalty to their employer …

- We are certainly going to respect the rights of employees to engage in activity protected by the National Labor Relations Act.  We are also going to protect our management right to expect the loyalty of our employees.  Public disparagement/disloyalty of the management of Santa Barbara News-Press and/or the newspaper it produces will not be tolerated, and appropriate discipline will be imposed.

- Please do not allow yourself to be "used" by a small group of employees who, in reality, are attempting to grab from management the right to determine the daily content of the pages of our newspaper.  This they cannot and will not do.

(A1856).

### C.    EMPLOYEES RETALIATE AND URGE READERS TO CANCEL THEIR SUBSCRIPTIONS.

Several reporters, including Zant and Hobbs, distributed thousands of pledge cards to readers that demanded SBNP "restore integrity" under threat of subscription cancellations. (T. 1907, A1601).  In a "community forum," Roberts and Burns publicly disparaged the content of SBNP. (A1604).  Burns demanded "a voice in the direction of the News-Press," lamenting "… the question before us is, will the News-Press reflect the world as Wendy McCaw sees it, or will it reflect the lives and hopes and vision of an entire community?" (A1602).

**D.    THE UNION MAKES CLEAR THAT ITS GOAL IS CONTENT CONTROL.**

On July 29, 2006, Union organizer Keegan and Union attorney Gottlieb appeared on a local radio show and admitted that the issues at SBNP were not about wages, hours, or terms and conditions of employment.  Keegan repeatedly explained that the employees and Union's motivation was over content control of SBNP:

- … here's where the problem lies … you expect to see what you would call fair and balanced news, or in this case, at least objective reporting … they've got ethics, and, and, and in journalism that they've got to try to stand up for, and this is becoming a big struggle nationally. (A2180).

- Someone asked the other day well, why, why is your union so intensely involved in this?  The fact is that labor unions understand that the voice in those communities are the newspapers.  And if we can't get stories about situations that arise in the paper, in the communities, into those newspapers, or we can't tell an opposite side of a story or for that matter present an opposition, a, a position, this is where the death or the, or the possible death of democracy starts. (A2188).

- … I would [worry] if this was simply just an issue of, let's say, the employees had a small grievance of some kind, but since, really and truly, the Freedom Of Press is a question here, and their ability to report what they see the way they see it, I don't feel that it's ever gonna cool off … (A2190).


Union attorney Gottlieb echoed Keegan:

- … what's going on [at SBNP] is the wall between the editorial and the ownership, and, I should say the editorial page, and run by the ownership, and the other writing in the paper, which is supposed to be

22

news, is supposed to be objective, I hate to use fair and balanced …
and that wall is coming down … And that is what's making the
reporters there look for some support collectively … (A2181).

- … I mean, it's not strictly a legal issue, but it, like any institution
  that's been around for a long time, and people get used to it, people
  identify with it, and people have certain expectations for it …
  (A2183).

- … there's got to be some kind of countervailing institutional internal
  way of making sure that the news remains the news and is properly
  and objectively reported, and they can do what they want on the
  editorial side, and that's presumably always gonna be the case … But
  that's what we're concerned about here at Santa Barbara News-Press
  is that, that wall, that countervailing structure that, that keeps the
  news, keeps journalistic integrity alive and functioning, that's been
  deteriorating which caused these editors to walk. (A2190).

- … if [the newspaper]'s only reflecting one side and if, if the Editorial
  side of the paper is bleeding into the, into the news, and, and
  becoming, and, and, and shaping the news, and, and, and deciding
  what actually gets printed and what's get, gets left out of a story, then
  there's a real problem with the paper … (A2192).

- I mean, the, the demands are really not that hard to meet, I mean,
  we're not asking to take Wendy McCaw's billions from her.  And, and
  journalistic integrity ought not to be a hard thing to, to achieve or re-
  establish.  So, you know, it's a little mysterious, other than just the
  issue of control, why there is this resistance, but there is. (A2193-94).

### E.    SBNP Hires Scott Steepleton to Manage the Newsroom.

SBNP hired Steepleton as Associate Editor in August 2006. (A76).  When

Steepleton informed the staff that his goal was to produce an unbiased product the

staff asked if McCaw was going to be "running" the newspaper. (A10-11) *Id*.

When Steepleton discussed the meeting with McCaw, McCaw instructed

Steepleton that Steepleton needed to be vigilant about bias, and, if need be, remove biased reporters. (A70-71, 73-75, 214-16).

### F.    EMPLOYEES ENGAGE IN UNPROTECTED INTIMIDATION TACTICS.

On August 24, 2006, during working time, and while on deadline, approximately 25 employees rose from their desks during working time and gathered around Hobbs' cubicle. (A289-99, 304).  Steepleton called HR Director Apodaca and apprised her of the situation. (A298).  Apodaca told Steepleton to instruct the employees to sit back down and continue working, which he did. (A298, 300).  Only one employee, Davison, followed Steepleton's order; the others ignored Steepleton's directive and marched loudly towards McCaw's office. (A298).  Steepleton again unsuccessfully directed the group to not leave the newsroom. (A299).

The group met McCaw's locked office.  McCaw was not at the facility.  The employees tried the glass door and rattled it to no avail. (A300). Undeterred, the group headed to Apodaca's office, bumped into Armstrong along the way, and demanded, of Apodaca, to see McCaw or von Wiesenberger. (A942).

Apodaca, who was in a meeting, agreed to arrange an appointment. (A942-43).  Shultz insisted on delivering a letter to McCaw. (A943).  Schultz later returned and delivered the letter to Apodaca. *Id.*

24

No employee ever told Steepleton that the activity was union-related; the march occurred during the workday, during working time. (A304). SBNP served warning letters upon employees. (A1377, 304-05). Additionally, SBNP issued a memorandum denouncing the employees' conduct. (A1591). SBNP did not suspend anyone, as the conduct did not continue. (A305).

The post-march "celebration" of the employees belied any notion that the march was peaceful or quiet. Shultz sent an August 25, 2006 e-mail stating: "Peeps, we rocked the house, crossed their wires and got em unglued. Way to go. Anybody feel free to grab me for the full run down on the letter delivery." (A2267). Evans confirmed the disruptive nature of the march: "Yes, Scott was very scared. Very scared." (A964, 2350, 2511). Shultz also wrote, "Hearing loss… must be due to that sonic boom we created during our blitzkrieg through the newsroom on our way to Wendy's office. Dammit, I must have banged on that saucepan too close to my head right before jackhammering our demands into the floor at HR;" (A1852, 2329).

### G.  INSULTING BUTTONS AND SIGNS APPEAR.

Employees wore, without recrimination, t-shirts, buttons, purses, and bags that displayed Teamsters, union, or other organized labor slogans in general. (A323, 692, 694). However, when reporters wore buttons to work and placed signs in their cars parked in the SBNP parking lot proclaiming, "McCaw obey the Law"

25

and "banish the bias," SBNP instructed employees to remove the offending buttons and signs. (A194-95, 692-93).  The "McCaw obey the Law" buttons and signs suggested that McCaw was a criminal and the "banish the bias" signs disparaged the newspaper. (T. 3556-57).

## V.    SBNP CONTINUES ITS GOAL OF ELIMINATING BIAS.

### A.    SBNP Eliminates All Non-Sports-Related Columns.

Consistent with the goal to eliminate bias, SBNP elected to cancel all non-sports-related columns in the newspaper. (A88-89).  Steepleton, through an e-mail, explained how the newsroom would restructure in light of the July 2006 resignations. (A95-99, 2063).  The idea was to focus on more local news stories. (A670).  Roshell (a pro-union reporter) responded with an August 14, 2006 e-mail stating, "Sounds like fun!" (A2064).  SBNP cancelled Steepleton's column first, as well as columns written by Orozco, Murdock, Rose, Thomas, Etling and Alcorn. (A89-93). Roshell never complained to Steepleton that her column was cancelled because of her union support. (A98).  On October 3, 2006, Roshell resigned, calling Steepelton and Apodaca "liars" and "bullies." (A2075).  When Steepleton thanked her for her work, Roshell said, "Fuck you too." (A.101-106).

26

### B.    SBNP TERMINATES BURNS FOR BIASED REPORTING.

On October 27, 2006, SBNP terminated Burns for biased reporting.  Since at least 2000, Burns had been warned to not allow her environmental bias to slip into stories and had received warnings to that effect. (A1854, 1933, 1494, 1702).

In late 2006, Burns wrote approximately 15 stories in favor of a controversial tax measure known as "Measure D." (A466-68, 1207, 1625).  Burns personally supported the measure and knew that SBNP opposed it. (A123, 2278).  Political activists adopted Burns' article – as opposed to an editorial – and put large pieces of it in a pro-Measure D mailer. (A2077).  The article accurately conveyed supporters' position. (1842).  Further, the mailer included an unauthorized use of the SBNP logo, giving the false idea that SBNP endorsed Measure D. (A2077, 2085).  SBNP wrote an editorial explaining that it continued to oppose Measure D. (UE 5).

Burns also wrote a biased article about La Casa de la Raza, entitled "Axis of Inequality," a story that she knew contained no counter-viewpoints. (A471).  Publisher Jim Buckley of the competing *Montecito Journal* wrote that Burns' article read like a La Casa de la Raza press release because it was so biased. (A1167-68, 2076).

27

SBNP discharged Burns explaining, "Despite this documented full and long history of biased reporting, you have utterly failed to change your ways.  It is evident that you choose to remain biased in your reporting." (A1485).

## VI.    SBNP INVESTIGATES A BREACH OF ITS CONFIDENTIALITY POLICY.

SBNP's handbook prohibits employees from disclosing proprietary information. (A939, 1887).  On December 15, 2006, SBNP discovered that McCaw's internal memorandum had been leaked to blogger Craig Smith, who ran a blog critical of SBNP. (A184-85).  Steepleton asked employees if they had leaked the memorandum to Smith and to sign a statement to that effect. (A186, 1592).  Employees copied the statement and asked to provide a copy to their union representative, which Steepleton allowed. (A186, 188, 190).  Certain employees refused to sign. (A190).  The interviews were brief, professional, and pleasant. *Id.* No employee claimed Steepleton to be hostile or prevented him or her from asserting any rights. (A193-94).  Union supporters and non-supporters were asked to and signed the statement. (A192-93).

## VII.  IN JANUARY 2007, SBNP EMPLOYED AN UN-INFLATED EVALUATION POLICY.

SBNP annually evaluated employees. (A47-49).  At management's discretion, and if economic conditions permitted, employees were eligible for – but not guaranteed – an annual bonus if two criteria were met: 1) be employed for at

least six months; and 2) receive a total cumulative performance evaluation score of 3.0. (A311-12, 316-17, 947).  When Steepleton replaced Roberts, Steepleton enforced the grading policy that Roberts had failed to apply. (A47-49, 146-47, 524-25, 554-55).  Steepleton personally performed the evaluations to avoid editors awarding inflated scores. (A48).  Certain employees received scores higher than in 2005; other employees received scores lower than in 2005 for their 2006 evaluation.

## A. DAVISON RECEIVES A LOWER SCORE FOR BIAS AND ATTEMPTED EXTORTION.

Davison received a score of 2.31 for 2006 because of her inability to correct long-standing problems with her reporting, and her refusal to help out with some night editing. (A142-44, 149-50, 2094).  Due to the mass resignations, Steepleton asked Davison to do some night editing; Davison demanded a guaranteed bonus before agreeing to work. (A142-44).  Steepleton explained that Davison "did not step up as a team player when the paper was in a crisis." (A151-52).

## B. HOBBS' PERFORMANCE EVALUATION REFLECTED HER BIAS AND USE OF PROFANITY.

Steepleton reviewed Hobbs' previous evaluations before completing her 2006 review. (A172, 1924, 1991, 2013).  Hobbs received lower scores because 1) Armstrong observed Hobbs say, "Fuck you Travis" when Roberts left the building (A1063, 2062); 2) bias in favor of cops (A2112); and 3) her inappropriate,

29

sensational writing (A175-77). These were not new criticisms. (A1924, 2062, 2112). Hobbs received a 2.7.

### C. HUGHES' 2006 PERFORMANCE EVALUATION CONSIDERED HER FAILURE TO INCREASE PRODUCTIVITY.

Steepleton reviewed Hughes' 2004 and 2005 evaluations. (A164-65, 1971, 2005). Hughes had been warned of repeatedly late stories. (A165-67). She continued to deliver late stories in 2006. (A169, 2167). Hughes received a 2.1.

### D. EVANS MISSED WORK AND MADE FALSE STATEMENTS ABOUT SBNP.

SBNP gave Evans a 2.8; Evans had a substance abuse problem requiring her to take a leave of absence during the year. (A155-58, 2086). In addition, prior to August 2006, Evans reported on the religion beat. (A152-53). When SBNP re-assigned beats to accommodate departures, SBNP assigned Evans to cover education. (A2061, 2063). Evans falsely informed local clergy that SBNP would no longer cover religion. (A152-53). Further, SBNP had to kill an Evans story when Steepleton learned that it had been drafted months earlier and contained stale, outdated quotes. (A154, 1776A).

### VIII. SBNP TERMINATES DAVISON FOR BIASED REPORTING.

SBNP terminated Davison on January 25, 2007 for biased reporting. (A613-614). Davison's environmental bias had been documented. (A2000, 2268, 2413,

2414).  On January 15, 2007, Davison wrote an article entitled "Walk this Way" that neglected to consider opposing viewpoints. (A114-15, 1405).  SBNP had written recent editorials on the issue; similarly, there were letters to the Editor opposing the project. (A283-84, 1402, 2341, 2339).  McCaw instructed Davison's supervisor, Guiliano, to reprimand Davison. (A1193, 1196-97).

On January 25, 2007, SBNP discharged Davison for her poor performance in 2006 and her biased "Walk this Way" article. (A1404).  Her discharge letter made special note of her failure to consult the opinion of SBNP before publishing her one-sided article.  *Id.*

## IX.  SBNP TERMINATES SUPERVISOR GUILIANO FOR POOR PERFORMANCE AND INSUBORDINATION.

SBNP discharged supervisor Guiliano on January 26, 2007. (A341-42).  Guiliano sent inappropraite e-mails to reporter Leana Orsua. (A203-21, 2111).  Orsua contemplated a sexual harassment charge. (A2140).  Guiliano knew that Orsua did not appreciate his contacts. *Id.*

Guiliano also accused Orsua of plagiarism. (A209, 2109, 2140).  The alleged "plagiarism" was quoting a statement published in a press release without citation to the release – a practice common in the industry. (A995-99).  Steepleton did not believe that Orsua had plagiarized. (A40-41, 215).

Further, McCaw reprimanded Guiliano for permitting Davison's "Walk this Way" article to publish. (A222). Guiliano conceded that Davison's article was biased. (A356-57, 1586). In response to McCaw's order to reprimand Davison, Guiliano "suggested that [Davison] continue to try to call that source and do another story; from the perspective of people who are against replacing the sidewalks and removing trees." (A2415). This was no reprimand; Guiliano disobeyed a direct order. In the case of a poorly written article, Steepleton explained, "You don't fix a biased story by writing another biased story." (A226-27).

Steepleton terminated Guiliano, explaining that Steepleton had lost confidence in Guiliano as a Manager. (A37). Guiliano never claimed that his discharge had anything to do with union-related matters, or with a refusal to reprimand Davison because she supported the Union. (A346-47). Guiliano's inspiration to claim his discharge as a violation of the NLRA stemmed from a meeting with Union attorney Gottlieb. (A348-49).

## X.    SIX EMPLOYEES ATTACK THE PRODUCT TO FURTHER THE GOAL OF CONTROLING NEWSPAPER CONTENT

On Friday, February 2, 2007, Evans, Hobbs, Kuznia, McManigal, Schultz and Zant engaged in outrageously disloyal conduct. (A820, 867-68). During rush hour, the six employees hung two large banners measuring 48 inches by 96 inches

32

on a footbridge over Highway 101 (Pacific Coast Highway). (A1393). Each

employee had read and received McCaw's warning about disloyalty. (A1856, 578,

609, 750-51, 825, 962, T. 3002). Both banners urged: "CANCEL YOUR

NEWSPAPER TODAY." (A1393, 2340, 2176). Employees endeavored to

convince passing motorists to cancel SBNP subscriptions. (A611-12).

The banners contained no accompanying Teamsters banner (A757); no

employee wore clothes bearing union insignia (A323); neither sign contained any

logo or language to suggest Union involvement (A461-62).

Certain Union-supporting employees refused to engage in the demonstration

because of fear that the activity was illegal. (A961-62). No one involved in the

display applied for or received a permit to hold or hang signs on the footbridge.

(A3507). A police officer came onto the bridge at a subsequent demonstration and

informed the former employees that their conduct was "completely illegal."

(A954).

SBNP investigated the disloyal conduct; Evans, Hobbs, Kuznia, McManigal,

Shultz, and Zant interviewed with a company attorney who was "pleasant" with his

questions. (A826, 963). When each employee admitted to involvement in the

banner display, each was discharged for disloyalty to SBNP. (A17-18, 53, 1396).

Significantly, this charge and the complaint alleged that only Steepleton questioned

employees. (A1335).  The ALJ denied an attempt to amend the complaint. (A1241-42).

### XI.   SBNP OBSERVES A DISRUPTIVE RALLY ADJACENT TO THE BUILDING.

Plaza De La Guerra is, essentially, the front yard of SBNP. (A2510).  Reporters held many noisy and disruptive rallies in the plaza, at times standing only eight feet from the facility's front door. (A565).  There had been instances of trespass, including someone placing a black wreath on the front door of the building. (A566).

In February 2007, rallies continued.  The rallies were loud and disruptive, intending to interfere with SBNP business. (A717).  An exemplar e-mail from Hobbs referred to Union members as "storm troopers," and called for a "loud protest in front of the SBNP" during a weekday. (A2337A).

SBNP hired an independent contractor, Diaz, to observe the public rallies in front of the building due to security concerns and trespass. (A2509, 2510, 938).  Diaz's charge was to protect the historic SBNP building and ensure ingress and egress to and from the building. (A718).

### XII.  THE UNION CONDUCTS A PUBLIC MEETING AT THE SANTA BARBARA PUBLIC LIBRARY.

In February 2007, Burns drafted a letter to SBNP advertisers inviting them to a meeting at the Santa Barbara Public Library. (A486-87, 1859, 2327).  The

letter did not seek to exclude anyone.  The letter also contained pejorative attacks against SBNP and McCaw, and included an unsubstantiated claim that SBNP provided advertisers false circulation numbers. (A1859).

Burns admitted that the letter sought to denigrate the newspaper and portray McCaw as a dictator. (A442).  Burns admitted she did not know if advertisers had false circulation numbers. (A440).  Similarly, she had no evidence to substantiate her false charge that SBNP "forced out" reporters. (A439).

Burns read, understood, and completed a library application, agreeing, "All meetings and events must be open to the public." (A2195, 1857-58, 443-44). Burns admitted that she was aware the meeting in the library was open to the public, pursuant to library rules. (A45).

A meeting occurred on February 13, 2007.  Advertisers and representatives from the religious community attended. (A720).  SBNP attorney Millstein and a private accountant (Colavincenzo) that regularly advertised in the newspaper (A2339F) attended the meeting.  Union organizer Keegan initially told Millstein to leave, but then invited him, stating, "Now that you're here, let's talk." (A448). Keegan admitted that there was no limitation regarding who could attend the meeting. (A925-30).

## XIII. SUBSEQUENT TO DISCHARGE, FORMER EMPLOYEES ASSAIL SBNP WITH VITUPERATIVE AND DEFAMATORY ATTACKS.

### A.    BURNS

Burns announced, "The old SBNP has been destroyed by a grossly incompetent and tyrannical owner" (A2250); "I'm sticking around to help oust Wendy, as long as I can figure out a way to make a living" (A2252); "I never would have believed that the newsroom where I worked for 21 years so proudly would collapse and fall victim to a Publisher who had no respect for her own workers or for the freedom of the press" (A2266); and calling McCaw "a scofflaw employer" (A2327).

### B.    JULY 14, 2007 LETTER

A July 14, 2007 letter signed by Burns, Davison, Evans, Hobbs, Kuznia, McManigal, Schultz, and Zant publically attacked SBNP and McCaw:

> … McCaw has robbed us of our jobs and our rights to a voice on the job.  She's robbed you of Your First Amendment rights to a free press.  We want to return to the paper to make sure that McCaw signs a fair employment contract with her employees, a Teamster Contract that would set in writing the standards of ethical journalism that every honest publisher should observe… Say "no" to the bully in De La Guerra Plaza.

(A2265).

36

## SUMMARY OF ARGUMENT

### XIV. SBNP'S FIRST AMENDMENT RIGHTS COMPEL GRANTING THIS PETITION FOR REVIEW.

The NLRB correctly conceded that the First Amendment assertions of SBNP were "novel" insofar as the specific issues raised went beyond the expertise of the NLRB. (A2819).  The NLRB, re-framed the case and applied the NLRA in derogation of SBNP's First Amendment rights.  In so doing, the NLRB disregarded judicial precedent, including that of the Central District of California and the Ninth Circuit on the applicability of the First Amendment to this particular case.  The NLRB, in a footnote, glossed over the courts' constitutional findings, excusing its indifference by asserting that the NLRB is not bound by the courts' decisions in a 10(j) proceeding. (A2818).  What the NLRB failed to appreciate, however, was that both courts issued judicial orders on a constitutional issue and the NLRB – an executive branch agency – is obligated to follow courts' factual and judicial findings on constitutional issues. The NLRB's Decision and Order elevated the NLRA to a status superior than that of the Constitution.

### XV. SECTION 8(A)(1) ALLEGATIONS

#### A. EMPLOYEE INTERVIEWS

SBNP's inquiry of employees, about the leak of a confidential, internal, memorandum to a non-union blogger, critical of SBNP was a legitimate exercise of

SBNP's management right.  The interviews contained no threats; the NLRB erred in its decision.

### B.    AN OPEN AND NOTORIOUS PUBLIC RALLY CANNOT BE THE BASIS OF SURVEILLANCE

Observing an open and notorious public rally outside of SBNP does not constitute unlawful surveillance.  The NLRB - without record evidence - determined SBNP videotaped rallies.  There was no evidence of filming; assuming *arguendo* SBNP filmed the rallies, SBNP would have had cause given the reasonable possibility of obtaining evidence of illegal conduct.

### C.    THE PUBLIC LIBRARY MEETING

Attending a public meeting – particularly one the Union agreed had to be open to the public – cannot violate the NLRA. Union representative Kegan even specifically invited SBNP to the meeting, once it arrived.  Similarly, there were no assertions that SBNP threatened employees at the meeting.

### D.    INSULTING SIGNS ARE UNPROTECTED

Personal attacks upon McCaw are not protected.  SBNP legitimately directed employees to remove disrespectful buttons and signs that attacked McCaw personally, and which made no reference to a labor dispute.

### E.    THE NEWSROOM MARCH

SBNP legitimately disciplined employees who, during working time

engaged in a "work stoppage," defied a supervisor's direct instruction to return to

work; and intended to disrupt the company's business.  The NLRB ignored record

evidence demonstrating the disruptive and hostile nature of the march.

## XVI. SECTION 8(A)(3) ALLEGATIONS

### A.    CANCELLING ROSHELL'S COLUMN

SBNP had a first amendment right to decide whether to publish Roshell's

column; she was not entitled to have her column published in the newspaper.

SBNP had the right to cancel Roshell's column to protect its editorial discretion.

### B.    BURNS' DISCHARGE

The NLRB conceded that there was no direct evidence linking Burns'

termination with protected union activity and based its entire finding upon

"circumstantial evidence."  The NLRB protected Burns' due to the "fortuity of

union activity" and ignored SBNP's ability to control the content of the newspaper.

Burns wrote biased articles.  SBNP grew tired of Burns' biased articles and for that

she was discharged.

### C.    DAVISON'S DISCHARGE

Davison, too, was discharged for biased articles.  Davison was not a "model

employee."  The NLRB decision demonstrated bias; as ALJ apparently disagreed

with the editorial stance of SBNP.  Again, the NLRB regarded the "mere fortuity of union activity" as protection for Davison.

### D.    PERFORMANCE EVALUATIONS AND BONUSES

Each performance evaluation was a legitimate reflection of employees' performance.  The NLRB presumed that employee performance remained static, annually. The NLRB ignored record evidence demonstrating that other employees' performance evaluation increased between 2005 and 2006, even those employees regarded as "union supporters."

### E.    THE FREEWAY SIX

Attempting to sabotage SBNP is not protected activity.  It is disloyal, especially when the identity of the saboteurs is kept form the public.  When employees illegally unfurled a banner on a highway overpass urging the public to "CANCEL YOUR NEWSPAPER TODAY," without a clear link to a union or a labor dispute, the actions were unprotected.  The NLRB further ignored the illegal nature of the employees' conduct and failed to acknowledge extant law explaining that illegal conduct is unprotected.

### XVII.    PUNITIVE, INSTEAD OF REMEDIAL RELIEF

Interest compounded daily is a punitive remedy.  The NLRB is a remedial statute.  The NLRB has no statutory authority to impose punitive remedies.

Ordering a notice reading is also a punitive remedy. The allegations at bar are not "extraordinary". Additionally, the bargaining unit employees are literate, negating the need for reading the notice.

## <u>STANDING</u>

SBNP has standing to pursue this Petition for Review pursuant to Section 10(f) of the NLRA, 29 U.S.C. §160(f).  SBNP "is an object of the [NLRB's Decision and Order] at issue," in this Petition for Review. *See Sierra Club v. Environmental Protection Agency*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). The Decision and Order of the NLRB is injury-in-fact to SBNP, the Decision and Order is the cause of that injury-in-fact, and the injury-in-fact is redressible before this Honorable Court. *Id.* at 898 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992)).

## ARGUMENT

## XVIII.    STANDARD OF REVIEW

The standard of review for a constitutional issue is *de novo*.  *See J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009) (" … a review in court owes no deference to the agency's pronouncement on a constitutional question (citation omitted) in other words, we entertain Cassone's due process claim *de novo*" (citation omitted)); *see also Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002) ("we are not obligated to defer to an agency's interpretation of Supreme Court precedent … there is therefore no reason for courts – the supposed experts in analyzing judicial decisions – to defer to agency interpretations of the Court's opinions.  This is especially true where, as here, the Supreme Court precedent, and subsequent interpretation, is based on constitutional concerns, an area of presumed judicial, rather than administrative, competence." (internal citations omitted)).

Additionally, as a matter of statutory construction, the "constitutional avoidance doctrine" explains that statutes should be interpreted so as to avoid constitutional problems, unless such construction is plainly contrary to the intent of Congress – the so-called "*Catholic Bishop*" rule.  *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501, 199 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *Accord*

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).

With respect to the NLRA, this court should "uphold an order of the Board unless it rests upon a finding not supported by 'substantial evidence' or the Board failed to apply the proper legal standard or departed from precedent without giving a reasoned justification therefor." *Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137, 1141 (D.C. Cir. 2011) (quoting *S&F Mkt. St. Healthcare LLC v. NLRB*, 570 F.3d 354, 358 (D.C. Cir. 2009) (quoting 29 U.S.C. § 160(f)).

## XIX. THE NLRA DOES NOT PROTECT EMPLOYEE AND UNION ATTEMPTS TO WREST EDITORIAL CONTROL FROM A NEWSPAPER PUBLISHER

The issue that touches each allegation in this case is SBNP's First Amendment rights of a free press. The NLRB crafted a decision that afforded no deference to SBNP's Constitutional rights. The goals of the employees and Union were to control the newspaper's content; this was not a protected goal. The actions taken by employees and the Union to further unprotected goals were similarly unprotected. SBNP's protective response actions, therefore, were lawful. Curiously, the NLRB, in a footnote, stated:

> We recognize that each side characterizes what was at stake in the employees' demands differently – [SBNP] as an effort to prevent it from exercising editorial control over the paper's content in order to prevent bias and the employees as an effort to preserve their autonomy as journalists in order to prevent the publisher and editor

> from inserting their editorial stance into coverage of the news.  We
> need not and do not address the question of which side's
> characterization is correct in deciding this case.

(Dec. 1, fn. 2).  The NLRB claimed to sidestep this issue, yet characterized

employees' actions designed to control the content of the newspaper as

"autonomy" and "journalistic ethics." (A2817).  The NLRB overstepped its

authority and pronounced:

> These were newsroom employees.  The management decisions at
> issue had and threatened to have a direct impact on the autonomy they
> had enjoyed in performing their work according to their perceptions of
> applicable professional norms as well as on their actual, day-to-day
> duties.

*Id.*  The NLRB decided the very issue it claimed to "not address."  The NLRB

endorsed enforcing the NLRA to wrest entrepreneurial control of the newspaper

from the owner to assuage the subjective "perceptions" of employees.

"Autonomy" of a newspaper reporter is not a term and condition of employment.

## XX.  THE NLRB DISREGARDED JUDICIAL PRECEDENT IN THIS CASE

The NLRB criticized SBNP for "ignoring" that two employee demands

related to wages, hours, and other terms and conditions of employment. (A2816-

17).  Conversely – and in contravention with judicial conclusions – the NLRB

ignored that the first demand – "restore journalism ethics to [SBNP]: implement

and maintain a clear separation between the opinion/business side of the paper and

45

the newsgathering side" – was not a term and condition of employment; was

repeated at union-led demonstrations on at least five separate occasions prior to the

election; that the Union called for a customer boycott if this demand was not met

(which occurred); and this demand was never retracted. *See McDermott v.*

*Ampersand Publ'g, LLC*, 2008 WL 8628728 at 6 (2010).  As explained by Judge

Wilson:

> It is the Court's view that the above-mentioned demand goes to the
> heart of [SBNP]'s editorial discretion.  In discussing this demand, the
> ALJ quoted the testimony of Melinda Burns, one of the discharged
> employees who stated:
>
> > To keep its credibility, a newsroom has to have
> > independence from the editorial side of the paper … the
> > editorial side is the opinion side.  The publisher's opinion
> > is in the editorials.  The news side has to have the
> > independence and freedom to report the news, gather the
> > news … and not to be pressured by the publisher to
> > report it or gather it in a certain way.
>
> (Citation omitted).  ***This quote makes clear what independently is***
> ***fairly obvious to the Court: The separation of the opinion/business***
> ***side of the paper and the newsgathering side is a demand related to***
> ***content control falling within the Publisher's editorial discretion.***

*Id*. at 6. (emphasis added).  Judge Wilson criticized the ALJ with the rebuke

equally applicable to the NLRB's Decision:

> … the ALJ did not acknowledge that the Union campaign was not
> simply making general demands to restore journalistic integrity, but
> making a specific demand related to the content of the News-Press.

46

Furthermore, this demand was not a general exhortation to [SBNP] to act or a communication made by some of the organizing employees, but in fact *a central demand of the Union campaign continually backed from early on in its history by public demonstrations and a Union-organized customer boycott putting economic pressure on [SBNP]… the Court must reject as clearly erroneous the ALJ's view that the Union campaign was not, at least in part, aimed at forcing concessions from [SBNP] directly related to its exercise of editorial discretion.* The ALJ's view on this point is contradicted by the ALJ's own specific findings with regard to the history of Union-related activities at the News-Press.

*Id*. (emphasis added).  The NLRB ignored these facts.

Significantly, Judge Wilson denied injunctive relief because "the sought after injunction amounts to state action limiting [SBNP]'s ability to combat pressure placed on it to limit its exercise of editorial discretion." *Id*. at 7.  The NLRB Decision contains the same error.  Judge Wilson further realized that the organizing efforts sought:

> … to affect [SBNP]'s editorial discretion and [the Union] undertook continual action to do so.  Therefore it does not seem possible to parse, at least in the manner the ALJ sought to do, [SBNP]'s animus toward the Union generally from its desire to protect its editorial discretion.  The motives necessarily overlapped in this case.  As a result, the Court cannot view the ALJ's determination in this regard as defeating Respondent's final First Amendment argument.

*Id*. at 9.  The employees' actions were unprotected; SBNP had the First Amendment right to dictate content.

### XXI. THE NLRB DISREGARDED JUDICIAL TEACHINGS ON SBNP'S FIRST AMENDMENT RIGHTS

The First Amendment prevents "governmental regulation" of "the exercise of editorial control and judgment" of a newspaper. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed. 730 (1974).  The Court affirmed that "[the] choice of material to go into a newspaper … constitute[s] the exercise of editorial control and judgment.  It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with the First Amendment." *Id.*

The NLRB incorrectly cited *Associated Press v. NLRB*, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed.2d 953 (1937) to buttress its decision in the instant case. (Dec. 5).  SBNP never claimed NLRA immunity due to the First Amendment.  SBNP sought the ***application*** of the First Amendment to prevent government intrusion – through regulation in the form of the NLRB's Order – in the content of the newspaper.  The repeated goal of SBNP employees and the Union was to control the content of the newspaper.  When the NLRA conflicts with the First Amendment, the First Amendment trumps and renders invalid any contrary statutory schemes. *See B.E.&K. Constr. Co. v. NLRB*, 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (lawsuit protected under the "petition clause" of the First Amendment, even if the lawsuit was retaliatory and unsuccessful); *see also Catholic Bishop* 440 U.S. at 506, 199 S. Ct 1313, 59 L.Ed.2d (NLRA inapplicable

48

to church-run schools, thus avoiding "sensitive questions arising out of the guarantees of the First Amendment…").

The NLRB admitted, "[t]he employees demanded, among other things, that [SBNP] refrain from interfering with their autonomy in reporting the news." (Dec. 5). The NLRB's finding reflects its error. No employee owned SBNP. No employee controlled the content of the newspaper. No employee had "autonomy in reporting news." Such a characterization belied the NLRB's proclamation that it did "not address the question of which side's characterization [of what was at stake] is correct in deciding this case." (A2815, fn. 2). The NLRB – with no authority to interpret constitutional matters – fashioned itself a super-editor of newspaper content to conclude that it did not violate the First Amendment rights of SBNP, in spite of two reasoned, judicial, decisions to the contrary.

The NLRB cited *Mitchell Manuals, Inc.*, 280 NLRB 230 (1986) as "persuasive authority." (A2817) *Mitchell Manuals* was a 2-1 NLRB decision where the majority overturned an ALJ. Significantly, the employees in *Mitchell Manuals* did ***not*** seek to control the ***content*** of the manual. There was no First Amendment issue in *Mitchell Manuals*. It's citation was conspicuous, given its inapplicability to overriding First Amendment protections.

49

## XXII.     THE NLRB'S ANALYSIS IMPROPERLY SHIFTED THE BURDEN OF PROOF

Assuming *arguendo* that the NLRA could be read to regulate the content of a newspaper, the NLRB did not apply Court precedent to protect SBNP's rights under the First Amendment.  The Court explained, in a defamation case, that to prevent a "chilling effect" that "would be antithetical to the First Amendment's protection of true speech on matters of public concern … plaintiff must bear the burden of showing that the speech is false before recovering damages." *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).  The NLRB analyzed the cancelled Roshell column; the terminations of Burns and Davison; as well as the performance evaluations of Davison, Hobbs, Evans, and Hughes under the burden-shifting analysis of *Wright Line*, 251 NLRB 1083 (1980) (A2839, 2843, 2849, 2854, 2858).  The NLRB required SBNP "to show by a preponderance of the evidence that it would have taken the action even in the absence of the employees' Union activity." (A2849).  The ALJ proclaimed, "It is important that [SBNP] bears the burden at this point in persuading by a preponderance of the evidence not only that Burns engaged in misconduct, but that it would have fired her for that conduct." *Id*.

By placing the burden upon SBNP to prove that its disciplinary action was an expression of its First Amendment rights, the NLRB demonstrated the problem expressed in *Hepps*: "There would be some cases in which defendants could not

50

bear their burden" even though the action was, in fact, motivated by First Amendment Free Speech and Freedom of the Press rights. *See* 475 U.S. at 776. The Court explained, "the Constitution requires" that a balance tip "in favor of protecting" SBNP's First Amendment-protected activity.  The NLRB improperly imposed a burden upon SBNP to convince the NLRB that SBNP's decisions were motivated through a desire to control the newspaper's content.

## XXIII.    THE NLRB DECISION CONSTITUTES REGULATION OF SBNP'S RIGHT TO CONTROL THE CONTENT OF THE NEWSPAPER

### A.    SBNP, EXCLUSIVELY, DETERMINES THE NEWSPAPER'S CONTENT

The NLRB gratuitously stated, "Generally, an employer is not required to bargain about the contents or design of its product. *Kiro, Inc.*, 317 NLRB 1325, 1327 (1995)." (A2820).  The NLRB's statement was a short shrift to First Amendment guarantees.  "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and the treatment of public issues and public officials – whether fair or unfair – constitute the exercise of editorial control and judgment." *Tornillo*, 418 U.S. at 258. Further, "otherwise valid laws may be invalidated in their application when they violate constitutional guarantees, including the First Amendment's guarantee of a free press." *Newspaper Guild of Greater Philadelphia v. NLRB*, 636 F.2d 550, 550 (D.C. Cir. 1990).  The NLRA cannot be interpreted to require bargaining over

"editorial content or other matters lying at the heart of a newspaper's independence," (*Id.*), because "editorial control and the ability to shield that control from outside influences are within the First Amendment's zone of protection and therefore entitled to special consideration." *Id.* at 560.

The NLRB's Decision rebukes these constitutional guarantees.  The NLRB simply dismissed the Ninth Circuit's holding that reinstating reporters discharged for writing biased articles inconsistent with SBNP's content demands is "bound to affect what gets published." *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 962 (9th Cir. 2010).  (A2819).  The NLRB engaged in sophistry, announcing that SBNP "remains free to continue publishing its newspaper as it sees fit and to insist that employees, including those who may be reinstated, conform to its editorial decisions and standards." (A2820).  The NLRB, in a footnote, employed a proverbial "fig leaf" proclaiming that its Order did not require SBNP to publish anything in particular, nor did its remedy "interfere" with SBNP's "editorial discretion." (A2820, fn. 14).  The NLRB ignored the candid testimony of Burns:

> [I don't] want to work for a vanity press where every article in the paper reflects the Editors', the Publishers', or the owners' views… [I want] to report the news as truthfully as I can and as fairly as I can **without a Publisher telling me how to write it**.

(D26 (emphasis added)).  SBNP had *already* disciplined employees for failing to "conform to its editorial decisions and standards."

The NLRB's Decision employed circular logic to create its results-based

Decision.  The Ninth Circuit addressed this flaw explaining:

> … that approach closes its eyes to what the underlying labor dispute
> here is about: the ability of the newspaper owner and publisher to
> exercise control over the news pages of the [SBNP] … Intervening to
> support the employees' effort to limit the control of [SBNP]'s owner
> over its news pages necessarily poses some risks to the owner's First
> Amendment rights.

593 F.3d at 962 (internal citations omitted).  And further:

> Telling the newspaper that it must hire specified persons, namely the
> discharged employees, as editors and reporters … is bound to affect
> what gets published.  To the extent the publisher's choice of writers
> affects the expressive content of its newspaper, the First Amendment
> protects that choice.

Id. (citing Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston,

515 U.S. 557, 572-573, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

## B.    The Organizing Effort was Unprotected

The NLRB's Decision advocates government intrusion into the regulation

and content of a newspaper. *Cf. Tornillo*.  The demands were about content, not

wages, not hours, nor terms and conditions of employment.   Keegan and Gottlieb

candidly admitted that the goal of the organizing drive was:

- "ethics;"

- labor unions wanting to "get stories [into] the paper … and tell an
  opposite side of a story or … opinion;"

- "rebuilding" the "wall" in the newspaper;

- subjective interpretations of the quality of the newspaper; and

- "the issue of control."

(A2178).  Employees complained of a lack of "separation between the opinion/business side of the paper and the newsgathering side." (A1595). Employees solicited the public to "help us ***take back*** the News-Press."  In a speech before hundreds of supporters, Burns demanded a "***voice in the direction*** of the News-Press," and the Union demanded that its "***vision*** of the community" be forcibly reflected in the content of the newspaper. (A1602).  Employees demanded ***restoration*** of "journalism ethics" and no "interference" in news. (A436-437, 740-41, 745-763).

By expanding the NLRA to wrest editorial control and content decisions from a Publisher/owner, the NLRB advanced an interpretation of the NLRA inconsistent with First Amendment guarantees. *See Tornillo*, 418 U.S. at 258 (free press clause prevents "governmental regulation" of "the exercise of editorial control and judgment" of a newspaper.)

# XXIV.    PURPORTED 8(A)(1) VIOLATIONS

## A.    STEEPLETON'S EMPLOYEE INTERVIEWS REGARDING THE LEAK OF A CONFIDENTIAL MEMORANDUM DID NOT VIOLATE THE NLRA

The NLRB, in adopting the ALJ's Decision, erred by equating inquiry about the dissemination of the leaked memorandum to non-Union Internet blogger Craig Smith with inquiry of dissemination to the Union.  Steepleton's interviews asked of no protected activity.

Steepleton's brief meetings with employees inquiring how the memorandum came to be posted on Smith's blog were consistent with SBNP's right to communicate per Section 8(c) of the NLRA.  ("…the expressing of any views, argument, or opinion shall not constitute an unfair labor practice if it 'contains no thread of reprisal or force or promise of benefit.'" 29 U.S.C. § 158(c)); *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).  SBNP had the right to communicate with its employees during a union organizing campaign. *See Rossmore House*, 269 NLRB 1176, 1177 (1984), aff'd sub nom. *Hotel Employees & Restaurant Employees Union, Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985).

The NLRB acknowledges "[i]nterrogation which does not contain threat or promise of benefit is protected by Section 8(c) and does not violate the NLRA." *MTR Sheet Metal, Inc.*, 337 NLRB 713, 716 (2002) (citing *Rossmore House*).  Steepleton's meetings were far less offensive than the conduct of the employer in

*Rossmore House* and *MTR Sheet Metal*.  Here, the ALJ gratuitously claimed there

to be "little doubt that a threat of discipline hovered over the questioning," but

cited no fact to support this claim. (A2852).

### B.    VIEWING A PUBLIC RALLY OUTSIDE THE FACILITY CANNOT VIOLATE THE NLRA

"[A]n Employer's 'mere observation' of open, public union activity on or

near its property does not constitute unlawful surveillance." *F.W. Woolworth Co.*,

310 NLRB 1197, 1197 (1993).  "It is well settled that an employer may lawfully

surveil employees engaged in protected activities in the open, and on or near the

employer's premises." *Alle-Kiski Med. Ctr.*, 339 NLRB 361, 364 (2003).

The Union hoped of attracting media attention during the rally.  Hobbs

testified there was a "main core of … media" that was "directly in front of the

grass area of De La Guerra Plaza." (A716).  It is absurd to find that observing an

open and notorious public rally that was intended to be seen by the public,

somehow chilled employees' NLRA rights.

Unaddressed by the NLRB was the inconsistency in the ALJ's Decision and

the fact that there was no videotape submitted at the hearing. After creating his

own facts, the ALJ concluded that SBNP did not show "why it found it necessary

to film" the rallies. (A2862).  However, assuming Diaz filmed the rallies, it does

not violate the NLRA for an employer to videotape when it has reason to believe it

may obtain evidence of illegal actions. *See Cable Car Advertisers, Inc.*, 324 NLRB 732 (1997).  Employees rallied at De La Guerra Plaza during the workday with the intention of making noise and disrupting work. (A717).  SBNP would have had legitimate cause to videotape the rallies, as a result.

### C.  ATTENDING A PUBLIC MEETING AND EXPRESSING VIEWS TO DEFEND MISREPRESENTATIONS DOES NOT VIOLATE THE NLRA

Observing a public meeting is not an unfair labor practice, particularly when the public is invited to attend. *See Mellin-Quincy Mfg. Co., Inc.*, 53 NLRB 366, 371 (1943) ("as meeting was advertised as "open to the public" … the attendance of [managers] did not constitute surveillance of the meeting.").  Further, pursuant to library rules, the meeting had to be open to the public. (A1857-58).

The NLRA permits employers to respond to mischaracterizations by a union. *See St. James Mercy Hosp., Inc.*, 307 NLRB 322 (1992) (Employer had the right to accurately portray facts union inaccurately characterized.)  Further, "Section 8(c) implements the First Amendment by requiring that the expression of 'any views, argument, or opinion' shall not be 'evidence of an unfair labor practice'." *NLRB v. Gissel Packing Co.*, 395 U.S. at 617.  SBNP had the right to defend itself in the public meeting even if offended or threatened to union members. *See Feldcamp Enterprises*, 323 NLRB 1193, 1200 (1997) (no NLRA violation when company agents attended union meeting "to heckle and disturb the speakers and members of

the audience" because union tacitly acquiesced to their presence by failing to ask them to leave).

The library meeting sought to damage SBNP's product.  There were no assertions that any statement of Millstein was threatening.  Union representative Keegan even said, "Now that you're here, let's talk." (A423). *See Osco Drug*, 237 NLRB 231, 234 (1978) (union acquiesced to company presence by failing to ask company representatives to leave).

### D.  DISPLAYS OF "MCCAW OBEY THE LAW" WERE UNPROTECTED; SBNP LEGITIMATELY DIRECTED EMPLOYEES TO REMOVE BUTTONS AND SIGNS ON CARS IN THE WORKPLACE AND ON COMPANY PROPERTY

The bias of the ALJ and, by extension, the NLRB, is reflected in the disposition of this allegation.  No charge has ever been personally filed against McCaw; no entity – including the ALJ or NLRB – determined that McCaw, personally, disobeyed the law. (A194-95, 1219-20).  The NLRB endorsed an *ad hominem* attack under the guise of a labor dispute.  The ALJ refused to separate McCaw, the individual, from SBNP, the company, and somehow transmuted company actions to McCaw's person. (A2856).

"[A]n employee by engaging in concerted activity, does not acquire a general or unqualified right to use disrespectful epithets toward or concerning his or her employer." *Lutheran's Social Serv. of Minn.*, 250 NLRB 35, 44 (1981)

(quoting *NLRB v. Blue Bell Inc.*, 219 F.2d 796, 798 (5th Cir. 1955)).  In *Md.*

*Drydock Co. v. NLRB*, 183 F.2d 538, 539 (4th Cir. 1950), union representatives

distributed a newsletter that "lampooned" the company president.  The company

forbade the distribution of the flyer.  The court set aside the NLRB's Order,

explaining:

> The company must maintain order and discipline in its plant; and we
> see no reason why it may not forbid the circulation on its premises of
> defamatory and insulting statements, which reasonably tend to destroy
> such discipline, for it is well settled that an employer is not to be held
> guilty of an unfair labor practice because of action reasonably taken to
> protect his property or preserve discipline against the unlawful
> conduct of employees.

*Id. See also Midstate Tel. Corp. v. NLRB*, 706 F.2d 401, 403 (2nd Cir. 1983)

(same); *Southwestern Bell Tel. Co.*, 200 NLRB 667, 670 (1972).

The buttons and signs, on their face, made no reference to a labor dispute.

The NLRB baldly asserted, "Statements such as … 'McCaw Obey the Law' are

clearly protected by the Act and are not disloyal." (2841).  Personal attacks –

particularly those without connection to a labor dispute – are undeniably disloyal

and unprotected. This was more egregious than *Five Star Transp., Inc.*, 349 NLRB

42 (2007); *see also Am. Golf Corp.*, 330 NLRB 1238, 1240 (2000).  Attacking

McCaw personally amounted to a "sharp, public, disparaging attack" on her

personally and affected SBNP "in a manner reasonably calculated to harm the

company's reputation and reduce its income." *Am. Golf*, 330 NLRB at 1241

(quoting *NLRB v. Local Union No. 1229, IBEW (Jefferson Standard)*, 346 U.S. 464, 471, 74 S.Ct. 172, 98 L.Ed 195 (1953)).  The mere fortuity of union activity is not a defense to disloyalty. 346 U.S. at 477; *see also NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 837, 104 S.Ct. 1505, 79 L.Ed.2d 839 (2001); *Endicott Interconnect Technologies, Inc. v. NLRB*, 435 F.3d 532, 536 (DC Cir. 2006).  The buttons and signs subjected McCaw personally, and in her capacity as Publisher, to "ridicule and contempt."  The signs, buttons were not protected.

### E.    THE NEWSROOM MARCH WAS UNPROTECTED; SBNP LEGITIMATELY DISCIPLINED EMPLOYEES

"Working time is for work." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 fn. 10, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).  The NLRB, in adopting the ALJ's Decision, determined the march was protected because it was a brief "work stoppage." (A2846).  The "work stoppage" occurred in direct contravention of a supervisor's order to return to work.  Concerted activity loses protection when it is disruptive to a company's business. *See Detroit News, Inc.*, 341 NLRB 947 (2004). If the intent of the employees was not to intimidate nor disrupt, it makes little sense that it took 25 employees ten minutes traversing the facility to deliver a solitary letter.

Further, the NLRB attempted to downplay the clear gloating of employees in their post-march e-mails describing the disturbing events. These exhibits only

60

surfaced as a result of a subpoena. (A2511).  Even assuming the ALJ correctly

categorized Shultz's e-mails as "self-congratulatory messages," the messages

belied notions of a peaceful, organized, and non-descript march. (A1825, 1852,

2267, 2329) Additionally, the NLRB ignored Evans' reply e-mail stating, "Yes

[Steepleton] was scared.  Very scared." (A2352, 964).  Added together, the

NLRB's findings do not reflect the record.

## XXV.    PURPORTED 8(A)(3) ALLEGATIONS.

### A.    SBNP Legitimately Cancelled Roshell's Column.

Roshell was not entitled to write a column as part of her terms and

conditions of employment.  Whether to publish columns is strictly a management

prerogative based upon SBNP's First Amendment rights. *See Passaic Daily News*

*v. NLRB*, 736 F.2d 1543 (D.C. Cir. 1984).  Roshell, herself, admitted that the

cancellation of her column was motivated by "the newspaper's desire to appear

free of bias by staff members." (A2065).

The NLRB, through the ALJ, erred by fashioning itself a super-editor.  The

ALJ waxed poetic of Roshell's awards (A2842), evaluations (A2842-43), and two

columns with a decidedly pro-union slant (A2843).  The ALJ, went so far as to

compare a separate editorial by employee Fuentes to support his editorial critique.

(A2844).

Faced with an apparent disagreement with SBNP's exercise of content in the newspaper, the ALJ surmised that the column cancellation "was akin to a demotion." (A2844). Roshell was never demoted. There is no evidence that she received lower wages, reduced hours, or more onerous working conditions. Assuming arguendo that the content of Roshell's columns offended the Publisher, and SBNP eliminated the column due to its content, SBNP had that unfettered right per *Tornillo*.

## B.    SBNP LEGITIMATELY DISCHARGED BURNS.

The NLRB modified the ALJ's opinion because the ALJ's analysis of "the quality of Burns' writing … created the appearance that the Judge improperly imposed his own judgment as to what constitutes biased reporting." (A2821, fn. 22). The NLRB ostensibly based its finding of an unlawful discharge exclusively upon circumstantial evidence. (A2822, fn 7). The NLRB acknowledged that there existed no direct evidence linking Burns' termination with protected union activity.

The General Counsel must satisfy the burden of demonstrating that anti-union animus motivated a termination. *See American, Inc.*, 342 NLRB 768, 768 (2004). Mere "suspicious [circumstances] are insufficient to warrant an inference that the respondent was motivated by anti-union animus." *Id*. (citing *Dorey Elec. Co.*, 312 NLRB 150, 151 (1993)) ("proof of suspicious circumstances is not enough" to demonstrate actual animus.) The NLRB based its finding on what it

62

apparently believed were "suspicious circumstances." An unlawful purpose for a company's actions should not be lightly inferred. *See NLRB v. Fed. Pacific Elec. Co.*, 441 F.2d 765 (5th Cir. 1971); *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245 (5th Cir. 1978).  Suspicion, conjecture, and theoretical speculation register no weight on the substantial evidence scale. *See Fla. Steel Corp. v. NLRB*, 587 F.2d 735, 742 (5th Cir. 1979); *NLRB v. O.A. Fuller Supermarkets Inc.*, 374 F.2d 197 (5th Cir. 1967).  Similarly, the mere fortuity of union activity does not insulate an individual from discipline. *See City Disposal Systems, Inc., supra.*

The ALJ rendered no part of his Decision upon circumstantial evidence. The NLRB's reasoning reeks of *post hoc* justifications of a flawed finding.  The NLRB even tried to shift the burden of proof, asserting that because Burns' article "had been approved by Steepleton," it was somehow unbiased.  Neither the ALJ nor the NLRB explained how this "finding" invalidated SBNP's discharge for bias. Burns had been repeatedly warned about bias in her writing (A1148, 1485, 1226, 1229, 1235-36, 2415).

The NLRB is not to engage in second-guessing SBNP's disciplinary decisions involving the performance of a journalist, given the inherently subjective criteria involved. *See WNAC-TV*, 264 NLRB 216, 221 (1982) (television employer "surely is entitled to judge for itself the standards it finds desirable" for reporters; such decisions, even if "unsound," should not be overturned so long as they are

"honestly made."); *see also Southwestern Broadcasters, Inc.*, 255 NLRB 330 (1981); *Intercity Broadcasting Corp.*, 281 NLRB 1210 (1986).

## C.    SBNP Legitimately Discharged Davison.

While the NLRB did not rely on the ALJ's statements regarding the quality of Burns' writing, there was no similar disregard of the ALJ's analysis of the quality of Davison's writing.  The NLRB, through the ALJ, once again fashioned itself a super-editor and second-guessed SBNP's editorial decisions.  The ALJ acknowledged, "It is not the role of the Board to decide whether the article was or was not biased or to substitute its judgment for that of the News-Press." (A2860).  The Decision belies this statement.

The ALJ, at least, recognized that SBNP "had long perceived Davison as having made biased environmental articles [and] [t]his demonstrates that McCaw's concerns were unrelated to Davison's union activity." (A2860).  The ALJ erred by stating, "McCaw never demanded at that time that Davison be fired because of the perceived bias." *Id*.  On April 8, 2006, McCaw wrote an emphatic letter to Cole about Davison's biased reporting. (A2037).  McCaw complained to former editors and publishers about Davison's bias for years, but to no avail. (A1148).  Once McCaw appointed new editors, Davison's continued biased reporting had meaningful consequences.

Davison's "Walk this Way" article failed to consider opposition to a controversial redevelopment plan in Santa Barbara, despite ample evidence of opposition easily accessible by Davison. (A1402, 2245, 283-84, 1070, 1402-03, 2245, 2341). The ALJ relied heavily upon a lengthy e-mail from a Desmond O'Neill as apparent authority on the tree-cutting measure. (A2858). The hearsay and opinion quality of the letter aside, it is not dispositive of anything. The ALJ offered no explanation as to how or why this particular opinion piece was authoritative, and implied that SBNP's editorial position was wrong.

The NLRB's Decision stands for the proposition that the mere fortuity of ostensible union activity insulates an employee from discipline. This is not so. The ALJ proved this point by bizarrely referencing pro-union employee Zate, who wrote a biased article that needed correction. (A1469, 2859). SBNP's lack of disciplinary action towards Zate and discharge of Davison demonstrated the non-discriminatory nature of Davison's discharge. The differing facts between Zate and Davison was that Davison had a long history of bias. An anti-union inference surrounding Davison's discharge, therefore, is unsupported by the record.[1]

---

[1] Davison also received one of the lowest performance evaluation scores of any reporter for 2006. (A1432).

### D.    PERFORMANCE EVALUATIONS AND BONUSES.

The ALJ examined prior performance evaluations to conclude that 2006 performance evaluations were discriminatory.  There was nothing "aberrant" about the lower scores to give rise to an inference of discrimination. *WNAC-TV*, 264 NLRB at 222.  The ALJ assumed that employee performance remained static from year to year.  This was error.

### 1.    *Davison*.

There is no question that Davison refused to change her schedule unless she received a bonus. (A623-24).  The ALJ made hay of the fact that once Davison rejected the request, it was not raised again. (A2855-56).  Further, the ALJ rebuked Steepleton for noticing that Davison was not working during working time and that Steepleton believed Davison "was conducting union activity during working hours." (A2856).  As "working time is for work," noticing employees not working and grading them appropriately for not working – regardless of suspected union activity – does not violate the NLRA. *Republic Aviation Corp.*, 324 U.S. at 803, fn. 10.

### 2.    *Hughes*.

Hughes failed to turn in stories on time.  (A165-67, 836-37).  Hughes' lack of productivity had nothing to do with union support. (A169-70).  Hughes' 2005 review contained multiple references to her inability to produce more stories for

66

the paper. (A2005). A goal for 2006, as reflected in the 2005 review, was to "reduce time on Public Square" and "produce more features." *Id*. Hughes did not meet this goal. (A836-37) The ALJ simply ignored this record evidence.

### 3.   *Evans.*

Evans battled substance abuse and took a month-long leave of absence. (A155-56). She admitted that her "head was caught up in getting better from my medical problem." (A822-23). She produced no stories during rehab. (A821-23). The ALJ criticized Steepleton for tactfully, instead of explicitly, referencing substance abuse in Evans' 2006 review. (A2854). Understandably, Evans disputed her performance evaluation, but the ALJ essentially determined that a dissatisfied employee's gripes demonstrate discrimination. Evans missed a month of work and was admittedly distracted at work. Her 2006 evaluation reflected this.

### 4.   *Hobbs.*

Hobbs had documented bias favoring law enforcement perspective in crime stories, and wrote sensationally. (A172, 1063, 1924). More egregiously, Hobbs said, "Fuck you, Travis" to Armstrong. (A2062, 2115). The ALJ ignored the fact that Hobbs admitted she had a problem with swearing (A738, 2123), and determined that SBNP concocted her outburst (A2854). If SBNP wanted to terminate a union leader, it would have done so at the time. SBNP's lack of

discipline demonstrated that it was Hobbs' performance, not union activity, that motivated her 2006 performance review scores.

### 5. *Further Error.*

The ALJ evaluated the quality of employees' union activity to support the notion of discrimination in the 2006 performance evaluations. (A2855). This was the ALJ's attempt to explain the lack of correlation between 2006 performance evaluations and Union support. Over 16 employees regarded as Union supporters received scores of 3.0 or higher, making them eligible for non-guaranteed bonuses. (A1783, 1796, 1808, 2103, 2126, 2133, 2147, 2157, 2368, 2378, 2390, 2400). In addition, the ALJ ignored *increased* scores for Union-supporting employees. (A1789, 1796, 1802, 1808, 2374, 2378, 2397, 2400, 2384, 2390, 2022, 2126, 935, 322-23, 326, 319, 683). The ALJ refused to acknowledge that employees perform poorly, and that SBNP could recognize poor performance. Perhaps most unexplained was why SBNP targeted these four employees when other employees who received bonuses or increased scores in 2006 had engaged in higher profile acts the NLRB deemed to be "union activity."[2]

---

[2] McMahon, who hosted a union meeting at her house in July 2006, received a 3.8 in 2006. (A369-370; A1783). Zant, who participated in the 2006 subscription cancellation campaign, received a 4.6 in 2006. (A2126). Patton, who participated in the August 24, 2006 march, received a 4.6 in 2006. (A699, 2390). Milton, who participated in the August 24, 2006 march, received a 3.5 in 2006. (A699) McManigal, who participated in the August 24, 2006 march, helped deliver the

### E.    THE FREEWAY SIX.

#### 1.    *Disloyalty is Unprotected.*

"There is no more elemental cause for discharge of an employee than disloyalty to his employer." *NLRB v. Local Union No. 1229, IBEW (Jefferson Standard)*, 346 U.S. 464, 74 S. Ct. 172, 98 L.ED.195 (1953); *see also Endicott Interconnect Technologies, Inc. v. NLRB*, 453 F.3d 532 (D.C. Cir 2006); *George A. Hormel & Co. v. NLRB*, 962 F.2d 1061, 1064 (D.C. Cir. 1992). Attempting to seize editorial control of a newspaper was an unprotected goal. As a result, activity designed to foster this unprotected goal was similarly unprotected.

The employees' disloyalty amounted to sabotage: the call to cancel the newspaper– without a clear link to a union or labor dispute – smeared SBNP's public reputations without revealing the obvious bias of disgruntled employees. *See Jefferson Standard*, 346 U.S. at 467. The banner was disloyal. The employees sought to do economic damage to SBNP to force SBNP to capitulate to the employees' unprotected goal of content control. (A1396).

Unmentioned by the NLRB was the fact that no Union supporters wore or displayed any Teamsters paraphernalia on the footbridge. (A319, 322-23, 326). Additionally, the protestors possessed a large Teamsters sign that had previously

---

demand letter to Armstrong, and spoke at rallies, received a 3.0 in 2006. (A697-99; 1080; 3274; 2147). Schultz, who participated in the August 24, 2006 march and spoke at rallies, received a 3.1 in 2006. (A697-99; 1924; 2157).

been displayed at rallies, but did not display it on the footbridge. (A757). The banner contained no reference to the Teamsters or a labor dispute, assuming that the dispute was legitimate. (A231, 2339, 2340).

The NLRB's error rested upon the notion that SBNP knew that the disloyal employees' actions were related to a labor dispute. (A2862). The standard is not what an employer knows; the standard is how damaging disloyal attacks impact an employer's reputation in the eyes of potential customers, absent indication of the obvious bias of disgruntled employees. *See* 346 U.S. at 467; *Five Star Transp., Inc.*, 349 NLRB at 45.

## 2. *The Arbitrary and Capricious Quality of the Decision.*

The NLRB Decision amounted to a Star Chamber. The NLRB first determined that the "protest was clearly linked to their ongoing dispute (and) … [t]he linkage was obvious" to Davison's and Burns' discharges due to much smaller, accompanying signs. (A2822). The NLRB then ***assumed*** that linking signs were viewable by motorists. *Id.* This finding was exceedingly convenient, as the ALJ denied, and the NLRB affirmed the denial, of an expert witness to rebut this assumption. (A2822, fn 23).

The NLRB further described an impossible paradigm, claiming (with no record evidence) that motorists "more than likely" understood the signs to be

70

directed at SBNP and that "anyone who understood that the 'Newspaper' referred to was [SBNP] also understood that the banners were part of the labor dispute." (A2822). Incredibly, the NLRB further asserted (again with no record evidence) that anyone not understanding the banners to be related to SBNP "could easily have understood [the banners] to be directed at papers in other cities …" *Id.* The NLRB proclaimed that the world intrinsically knew the goals of the protesting employees related to SBNP; but even if someone did not, it was of no matter. This reflected arbitrary and capricious decision-making.

### 3.    *Illegal Conduct is Unprotected Conduct.*

The protesting employees committed a misdemeanor by posting freeway sings without a permit. Their conduct was illegal.[3] (A1211-1213A, 2238, 2253, 2357, 2358, 2424, 2448, 2473). The NLRB, through the ALJ, concluded that the illegality of the action was irrelevant "because [SBNP] did not fire these employees for any illegal conduct." (A2896). The citation to *Molon*, 302 NLRB 138 (1991), enfd. 965 F.2d 523 (7th Cir. 1992) was inapplicable, as the NLRB made a factual determination: whether the employer discharged employees for protected activity or for their later illegal conduct. *Id.* at 139. In the instant case, the protesting employees' activity was illegal, thus unprotected, from the onset. Unlawful activity is unprotected. *See NLRB v. Fansteel Metallurgical Corp.*, 306

---

[3] This could explain the lack of a Teamsters sign and paraphernalia.

U.S. 240, 252, 59 S.Ct. 490, 83 L.Ed. 627 (1939); *Southern S.S. Co. v. NLRB*, 316

U.S. 31, 48, 62 S.Ct. 886, 86 L.Ed. 1246 (1942); *Saint Joseph Hosp. Corp.*, 260

NLRB 691, 693 (1982) (illegal picketing by employees was unprotected and

suspension for unlawful picketing did not violate the NLRA).

### F.     UNENFORCED SUBPOENAS

The NLRB erred by failing to enforce subpoenas served by SBNP that had

the potential to reveal relevant evidence relevant to SBNP's defenses. (A2501-08,

2620-2714).  After acquired evidence - including disloyalty or defamation - is

relevant. *See McKennon v Nashville Banner Pub. Co. 513 U.S. 352, 115 S. Ct. 879,*

*130 L.Ed. 195 (1995)*.

## XXVI.    THE NLRA DOES NOT PERMIT THE NLRB TO ORDER PUNITIVE REMEDIES.

### A.     INTEREST COMPOUNDED DAILY

The NLRA is a remedial statute.  *See Teamsters Local 115 v. NLRB*, 640

F.2d 392, 401 (D.C. Cir. 1981).   The NLRB, in *Ky. River Med. Ctr.* 356 NLRB

No. 8 (2010), deviated from this tenet and calculated interest at a far more

generous rate than granted under other discrimination laws.  Other laws designed

to thwart discrimination calculate interest compounded annually. *See e.g. Hylind v.*

*Xerox Corp.*, 749 F.Supp.2d 340 (D.Md. 2010)(Title VII); *Scott v. Peterson*, 2010

WL 3173001 (N.D.Ill. 2010)(29 U.S.C. §1981 and 1983) *Hite v. Vermeer Mfg.*

*Co.*, 361 F.Supp.2d 935, 950 (S.D.Iowa 2005)(FMLA). Courts have declined the invitation to compound interest at a rate greater than a per annum compounding. *Ky. River Med. Ctr.* was wrongly decided.

The NLRB lacks the statutory authority to impose punitive remedies. The *Ky. River Med. Ctr.* decision imposed a punitive remedy in the form of interest calculated daily. *See, e.g., Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10-12 (1940).

## B.   NOTICE READING

The Board ordered a Notice Reading. This was an inappropriate remedy. Only "extraordinary[4] circumstances," warrant reading a notice. *See First Legal Support Servs., LLC*, 342 NLRB 350, fn. 6 (2004). Such a remedy has traditionally been rejected. *See Am. Property Holding Corp*., 350 NLRB 998 (2007); *Chinese Daily News*, 346 NLRB 906 (2006); T*eamsters Local 115 v. NLRB*, 640 F.2d 392, 401 (D.C. Cir. 1981); *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*., 383 F.2d 230, 232-33 (D.C. Cir. 1967), cert. denied, 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968).

## C.   ELECTRONIC NOTICE POSTING

*SBNP* objects to the electronic posting requirements as (1) electronic postings are not directly analogous to physical postings, (2) federal courts and agencies do not require use of electronic communications as a remedial matter, (3)

_____

[4] Courts already denied the extraordinary remedy of an injunction in this case.

electronic posting requirements impose additional burdens on SBNP and its information technology personnel, and (4) electronic postings do not account for the increased risk of anonymous alteration and broad distribution to non-employees, customers, and competitors, thus acting as a punitive measure perverting the remedial purpose of the NLRA.

## XXVII.    NLRB SHOULD HAVE DISMISSED THE COMPLAINT

The NLRB erred by not granting the Exceptions of SBNP and dismissing the Complaint in its entirety. (A2715-2754); *see* also Brief of SBNP in Support of Exceptions lodged with the Court 3-12-12.

## CONCLUSION

WHEREFORE, SBNP respectfully requests that this Petition for Review be granted for the reasons expressed in this brief and for any additional reasons this Honorable Court deems just and proper.

Dated:                    March 12, 2012

                         Nashville, Tennessee


Respectfully submitted,


                         /s/ L. Michael Zinser
                         L. Michael Zinser

                         /s/ Glenn E. Plosa
                         Glenn E. Plosa

                         **THE ZINSER LAW FIRM, P.C.**
                         414 Union Street, Suite 1200
                         Nashville, Tennessee 37219
                         Telephone:  (615) 244-9700
                         Facsimile:   (615) 244-9734

                         Attorneys for Santa Barbara News-Press

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to FRAP 34(a), SBNP respectfully requests Oral Argument for this case.  SBNP submits that Oral Argument is necessary to resolve the issues raised in this appeal.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to FRAP 32(a)(7) and Local Rule 32(a)(2), SBNP asserts that:

1. This brief has been prepared using Microsoft Word 2011 for Macintosh and uses a fourteen-point, proportionately spaced, serif typeface (Times New Roman).

2. EXCLUSIVE of the Certificate as to Parties; Corporate Disclosure Statement; Table of Contents; Table of Authorities; Glossary; Request for Oral Argument; and Certificates of Counsel, this brief contains 13,905 words, including footnotes.

I understand that a material misrepresentation can result in the Court's striking this brief and imposition of sanctions.  If this court requests, I will provide an electronic version of this brief.

March 12, 2012                                    /s/ Glenn E. Plosa
(Date)                                             Glenn E. Plosa

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 12th day of March, 2012, I

served the foregoing OPENING BRIEF OF AMPERSAND PUBLISHING, LLC, D/B/A

SANTA BARBARA NEWS-PRESS **via the CM/ECF system, and served courtesy**

**copies via overnight Federal Express** upon the following:

Linda Dreeben, Esq.
Julie Broido, Esq.
Kira Vol, Esq.
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C. 20570

Ira L. Gottlieb, Esq.
Bush Gottlieb Singer Lopez
  Kohanski Adelstein & Dickinson
500 North Central Avenue, Suite 800
Glendale, CA 91203


                                    /s/ Glenn E. Plosa
                                    Glenn E. Plosa

# ADDENDUM

## UNPUBLISHED DECISIONS

Referenced on Pages 46-47, 62:

> *McDermott v. Ampersand Publ'g, LLC*, Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Ca. 2008)

Referenced on Page 72:

> *Scott v. Peterson*, 2010 WL 3173001 (N.D.Ill. 2010)

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
**(Cite as: 2008 WL 8628728 (C.D.Cal.))**

Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
James J. McDERMOTT, Regional Director, Region 31 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,
v.
AMPERSAND PUBLISHING L.L.C. d/b/a the Santa Barbara News–Press, Respondent.

No. CV 08–1551(SVW) (MANx).
May 22, 2008.

Brian Dean Gee, Margaret Hume, Steven Douglas Wyllie, Mori Pam Rubin, National Labor Relations Board, Los Angeles, CA, for Petitioner.

Abby Claire Schwartz, O'Melveny and Myers, Los Angeles, CA, Troy A. Thielemann, Cappello and Noel, Santa Barbara, CA, Ira Lawrence Gottlieb, Bush Gottlieb Singer Lopez Kohanski Adelstein & Dickinson, Glendale, CA, for Respondent.

ORDER DENYING PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT [1] STEPHEN V. WILSON, District Judge.

**I. Introduction**

**\*1** Petitioner James J. McDermott, Regional Director of the 31st Region of the National Labor Relations Board ("the Board"), seeks a temporary injunction on behalf of the Board pursuant to Section 10(j) of the National Labor Relations Act ("NLRA") against Respondent Ampersand Publishing, L.L.C. d/b/a The Santa Barbara News–Press ("News–Press"). (Pet., at 1.) The injunction is sought pending final disposition before the Board of a complaint ("the Complaint") based on unfair labor practice charges filed by Graphic Communications Conference, International Brotherhood of Teamsters ("the Union"). Petitioner issued the fil-

ings constituting the Complaint on May 31, 2007. (Pet. Mem., at 1.) A hearing on the Complaint was held before Administrative Law Judge William G. Kocol ("the ALJ"), which commenced on August 14, 2007 and ended on September 26, 2007. (*Id.*) The ALJ issued a final recommendation finding Respondent committed numerous unfair labor practices under Section 8 of the NLRA on December 26, 2007 and ordering appropriate equitable relief. (*Id.*; Pet. Ex. 2, at 57–106.) Petitioner seeks an injunction requiring Respondent to rescind its prior alleged unfair labor practices by reinstating eight discharged employees and removing all references to prior disciplinary actions arising from union activity in their personnel files. The proposed injunction also requires Respondent to refrain in the future from committing a variety of specific unfair labor practices. (Pet., at 11–13.)

**II. Factual Background**

Respondent owns and operates the News–Press, a daily Santa Barbara newspaper. (Pet. Mem., at 5.) In April 2006, Wendy McCaw, owner and chief executive officer of Respondent, appointed herself and Arthur von Wiesenberger as co-publishers of the News–Press. (*Id.*) Subsequently, clashes erupted between publishers and reporters of the News–Press over issues of content, resulting in the resignation of seven newspaper employees. (*Id.*, at 5–6.) Beginning in July 2006 a group of News–Press reporters began meeting with the Union and organizing for union representation. (Pet. Mem., at 6; Pet. Ex. 2, at 40.) On August 10, 2006, the Union filed a petition with the Board to hold a union election for a unit of Respondent's news department employees. (Pet. Mem., at 8.) On September 27, 2006, news department employees voted 33 to 6 in favor of Union representation in a Board conducted election. (*Id.*) On August 16th, 2007, the Board certified the Union as the exclusive bargaining representative of a unit of news department employees. (*Id.*) Respondent was found by the ALJ to have engaged from August 17, 2006 to February

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

21, 2007 in a number of unfair labor practices in violation of Section 8(a)(1) of the NLRA. (Pet. Ex. 2, at 54–100.) Respondent and the Union began negotiations still ongoing for a collective-bargaining agreement on November 13th, 2007. (*Id.*)

### III. Analysis

A. *Nature of the Alleged Unfair Labor Practices*

**\*2** Before analyzing the appropriateness of equitable relief, the nature of Respondent's underlying alleged unfair labor practices must be discussed. The demands of Petitioner's requested injunction are predicated entirely on violations of Section 8(a)(1) and Section 8(a)(3) of the NLRA found by the ALJ to have been committed by Respondent. Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights" to "form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 158(a)(1); 29 U.S.C. § 157; *see, e.g., California Acrylic Industries, Inc. v. N.L.R.B.,* 150 F.3d 1095, 1099 (9th Cir.1998); *N.L.R.B. v. Mike Yurosek & Son, Inc.,* 53 F.3d 261, 264 (9th Cir.1995). "Concerted employee activities are protected when 'the activities can reasonably be seen as affecting the terms or conditions of employment.' " *Yurosek,* 53 F.3d at 266 (quoting *Gatliff Coal Co. v. NLRB,* 953 F.2d 247, 251 (6th Cir.1992). An employer hence violates Section 8(a)(1) "by engaging in activity that tends to chill an employee's freedom to exercise" rights protected by the NLRA. California Acrylic Industries, 150 F.3d at 1099.

Section 8(a) (3) of the NLRA makes it an unfair labor practice, "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer therefore violates Section 8(a)(3) by disciplining or discharging an employee

for engaging in union-related activity. *See NLRB v. Transportation Management Corp.,* 462 U.S. 393, 395, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), *abrogated on unrelated point, Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries,* 512 U.S. 267, 268, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994). A violation of Section 8(a)(3) as a general matter also amounts to a violation of Section 8(a)(1). *See Id.*

In analyzing whether violations of Section 8(a)(3) and violations of Section 8(a)(1) derivative of Section 8(a)(3) violations occurred, the ALJ properly applied the shifting burden analysis laid down by the Board in *Wright Line,* 251 NLRB 1083 (1980) and approved by the Supreme Court in *Transportation Management Corp.,* 462 U.S. at 404. (Pet. Ex. 2, at 50.) Under the analysis outlined in *Wright Line,* the petitioner "must prove by a preponderance of the evidence that union animus was a substantial or motivating factor in the adverse employment action. The elements commonly required to support such a showing are union or protected concerted activity by the employee, employer knowledge of that activity, and union animus on the part of the employer." *Consolidated Bus Transit,* 350 NLRB No. 82, slip op. at 2 (Aug. 31, 2007). If petitioner makes this showing "the burden then shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even in the absence of the employee's union activity." *Id.* at 3.

**\*3** Applying this analysis, the ALJ found relevant to the Petition that Respondent violated Section 8(a)(1) and 8(a)(3) of the NLRA between August 31, 2006 and February 6, 2007 by instructing employees to remove buttons and signs supportive of the Union from their persons and vehicles, coercively interrogating employees with regard to their Union-related activity, issuing letters of suspension to employees because of their Union-related activity, giving lower evaluations to employees because of their Union-related activity, and discharging eight reporters employed by the News–Press for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
(Cite as: 2008 WL 8628728 (C.D.Cal.))

Union-related activity. (Pet. Ex. 2, at 99; Pet. Mem., 10–18.)

B. *Standard for Equitable Relief*

Under most circumstances, a federal district court does not have jurisdiction over fair labor standards disputes. The Board adjudicates these disputes at the "trial" level and the Court of Appeals reviews the Board's decisions. *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.,* 19 F.3d 449, 458 (9th Cir.1994) (en banc). The Court of Appeals' review of a Board decision is deferential: "The Board's [remedial] order will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [National Labor Relations Act]." *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

Section 10(j) of the NLRA, 29 U.S.C. § 160(j), creates an exception to the district court's lack of jurisdiction over fair labor practices:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j). "[I]n determining whether interim relief under 10(j) is 'just and proper,' district courts should consider traditional equitable criteria." *Miller,* 19 F.3d at 459. Hence, "[t]o secure relief under section 10(j), the Regional Director [of the Board] must show 'either (1) a combination of probable success on the merits and the possibility of irreparable harm or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits.' " *Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates,* 241 F.3d 652 (9th Cir.2001) (quoting *Miller,* 19 F.3d at 456). "If the respondent concedes the substance of the unfair labor practice charge, or if the Board demonstrates that it is likely to prevail on the merits, we presume irreparable injury" and no further inquiry is necessary. *Miller,* 19 F.3d at 459–460. However, if the Board can make only a "colorable evidentiary showing" then the Court must engage in an irreparable injury analysis and balancing of the hardships. *Id.* at 459. "This is in keeping with our normal sliding scale standard of injunctive relief." *Id.* The burden for a showing of likelihood of success in the 10(j) context is low in light of "the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." *Id.* at 460. "[T]he Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Id.* "Essentially, the Regional Director [of the Board] must demonstrate 'a better than negligible chance of success' to get into the injunction game." *Aguayo v. S & F Market Street Healthcare, LLC,* 2006 WL 941183, at *2395 (C.D.Cal. Mar.22, 2006) (quoting *Scott,* 241 F.3d at 662). *But see infra,* at 27–28 (determining that, due to the First Amendment issues present in this case, a higher bar must be applied to the Petition).

**\*4** In applying these criteria, the Court must operate "through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller,* 19 F.3d 459–60. The Court should always be cognizant that "[t]he public interest is an important factor in the exercise of equitable discretion." The public interest at issue in 10(j) cases of course "is to ensure that an unfair labor practice will not succeed because the Board takes too long

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
(Cite as: 2008 WL 8628728 (C.D.Cal.))

to investigate and adjudicate the charge." *Id.* at 460.

C. *Impact of Presence of First Amendment Issues*

Respondent urges the Court in this case to both dispense with the usual deference accorded to the Board's interpretation of the NLRA and apply a higher bar for granting equitable relief because the injunction sought by Petitioner potentially infringes Respondent's First Amendment rights as an owner and publisher of a newspaper.[FN1] (Supp. Opp., at 3.) In *Overstreet v. United Broth. of Carpenters and Joiners of America,* the Ninth Circuit held that "the position of the NLRB is not entitled to special consideration" where there is a "significant risk" that granting the injunction sought will "sanction[ ] a violation of the First Amendment." 409 F.3d 1199, 1210 (9th Cir.2005). "[B]ecause constitutional decisions are not the province of the NLRB (or the NLRB's Regional Director or General Counsel), the tasks of evaluating the constitutional pitfalls of potential interpretations of the [NLRA] and of interpreting the [NLRA] to avoid those dangers are committed *de novo* to the courts." *Overstreet,* 409 F.3d at 1209.[FN2] This rule operates as a corollary to the traditional constitutional avoidance doctrine requiring courts to construe federal statutes so as to avoid raising "serious constitutional problems ... unless such construction is plainly contrary to the intent of Congress.' " *Id.* at 1209 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). The standard for finding a "significant risk" of a First Amendment violation under *Overstreet* is low. In order to determine whether there is a significant risk of a First Amendment violation a court "need not decide whether the First Amendment *does* protect the [enjoined actions], or even whether it probably does." *Overstreet,* 409 F.3d at 1209 (emphasis in original). In *Overstreet,* the Ninth Circuit found that the Board's requested injunction of union members' display of banners and distribution of handbills on public property posed a significant risk of infringing the union members' First Amendment rights. *Id.* at 1212. Though there was no controlling

authority that definitively established that the injunction infringed the union members' First Amendment rights, the panel found sufficient supportive authority with analogous facts "to recognize that the [union members'] argument is a plausible, and quite possibly meritorious, one." *Id.* at 1211. Hence, in order to demonstrate that the injunction significantly risks infringing Respondent's First Amendment rights, Respondent need only raise a plausible First Amendment argument not necessarily clearly established by existing authority. *See also N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 502, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (indicating that the Court could find that application of the NLRA to church-operated schools posed "significant risk" of violating First Amendment guarantees without resolving Board's counterargument).

> FN1. Respondent also urges the Court to dispense with the usual deference owed the Board because the bringing of the Petition is unauthorized under Section 10(j). Respondent argues that the bringing of the Petition was not expressly consented to by the Board as is required under the NLRA for Section 10(j) petitions. (Supp. Opp., at 9.) As the Court finds the presence of First Amendment issues in this case requires the Court to dispense with the usual deference owed the Board, the Court chooses not to reach this separate statutory argument seeking the same result.

> FN2. Though *Overstreet* involved an injunction requested under Section 10(1) of the NLRA as opposed to Section 10(j), the panel in *Overstreet* noted that there was no reason the statutory differences between the two types of injunctions "should affect the courts' standard for determining whether to grant an injunction applied for." 409 F.3d at 1205. Therefore, the Court sees no reason why the holding of *Overstreet* as to the impact of the First Amendment on the

appropriate standard of review is not applicable to the instant Petition. Petitioner has not attempted to make any argument to the contrary.

**\*5** The Ninth Circuit in *Overstreet* also separately noted that, "where ... there is at least some risk that constitutionally protected speech will be enjoined, only a particularly strong showing of likely success, and of harm ... could suffice." *Id*. at 1208 n. 13. The meaning of this statement in the context of the *Overstreet* decision is somewhat enigmatic. It appears to hold that, even if a court does not find that a proposed injunction significantly risks violating the guarantees of the First Amendment, if it finds that the proposed injunction is in "some risk" of doing so, the court should require a particularly strong showing with regard to all the equitable factors, while still providing ordinary deference to the position of the Board with regard to its interpretation of the NLRA. Presumably, the type of risk that would qualify as "some risk" is less than a "significant risk." However, as the Court finds the injunction significantly risks infringing Respondent's First Amendment rights, the Court need not delve in to the issue of what minimal level of risk would qualify as "some risk" under *Overstreet*.

The Court's view is that Respondent is correct in its assertion that issuing Petitioner's requested injunction significantly risks infringing the First Amendment rights of Respondent. The Supreme Court long ago determined that as a general matter an agency of the press has no "special immunity" from application of the NLRA or any general law. *Associated Press v. National Labor Relations Board,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 81 L.Ed. 953 (1937). Since this decision, the Supreme Court has clarified that there are certain decisions of agencies of the press that can in fact be excepted from general regulations. Specifically, in holding unconstitutional a statute requiring newspapers to afford equal space to political candidates to answer criticisms by a newspaper, the Supreme Court has

declared:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials-whether fair or unfair-constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1971). In line with this ruling, the D.C. Circuit subsequently refused to uphold an order issued by the Board against a newspaper requiring it to reinstate a discharged columnist and resume publication of his weekly column on the grounds that it interfered with the newspaper's First Amendment-protected editorial discretion. *Passaic Daily News v. N.L.R.B.,* 736 F.2d 1543, 1558–59 (D.C.Cir.1984). Respondent asserts that these rulings indicate that the injunction sought by Petitioner significantly risks violating Respondent's constitutionally protected editorial discretion in a number of ways. Though the Court is not entirely persuaded by all of Respondent's arguments in this vein, the Court does find that in at least one manner Petitioner's requested injunction in its entirety does pose a significant risk of violating Respondent's First Amendment rights.

**\*6** Respondent asserts that its First Amendment rights are violated by the sought after injunction in essentially three analytically distinct ways, of which the Court finds two to be of definite concern. First, Respondent argues that the aspects of the requested injunction requiring it to reinstate certain discharged reporters and not discharge its current reporters for union activity would inherently infringe its First Amendment rights by forcing it to publish reporters' articles against its will. (Supp. Opp., at 7–8.) Hence, Respondent argues, even if the injunction were otherwise warranted, the Court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
(Cite as: 2008 WL 8628728 (C.D.Cal.))

cannot force Respondent to reinstate the discharged reporters or retain its current reporters without violating Respondent's First Amendment rights. Respondent points most relevantly to *Passaic,* where the D.C. Circuit refused to affirm a Board injunction reinstating a newspaper's weekly columnist and ordering resumption of his column.[FN3] The Court regarded such an injunction as a clear infringement of the newspaper's First Amendment-protected editorial discretion. However, the court made clear it was specifically troubled by the mandate of publication contained within the order issued by the Board, qualified only by vague language in the order stating the publication would be "subject to the same lawful standards and requirements that Respondent, as an employer, imposes or may impose on its employees." 736 F.2d at 1559. The court noted that "an order that merely directed the [publisher] to not discriminate against [the columnist] on the basis of his union activity would present a much closer case." *Id*. On remand, the Board formulated a new, more specific order that went unchallenged requiring the newspaper to restore the columnist to his position and "decide whether to publish his submissions based upon any factors other than his union or protected activity; provided that nothing in this Order shall be interpreted as a requirement that the Respondent publish any of the columns submitted by [the columnist]." *Herald News,* 276 NLRB 605, 606 (1985). The Court believes it would be possible to issue a similarly crafted injunction in this case. However, the D.C. Circuit regarded even such an injunction as presenting a close case. Therefore, the Court cannot say that the limited aspects of the requested equitable relief ordering reinstatement of the discharged reporters and circumscribing the acceptable reasons for discharge of current reporters pose no significant risk of a First Amendment violation. It should be noted this finding is not applicable to the various aspects of the proposed injunction not related to the reinstatement of former News–Press reporters and potential discharge of current News–Press reporters. Furthermore, this finding is ultimately subsumed by the Court's finding that the entire requested injunction significantly risks infringing Respondent's First Amendment rights on the final basis discussed below. *See infra,* at 15–28.

> FN3. Respondent also relies on *Collard v. Smith Newspapers,* but the holding in that case found only that the First Amendment provided the defendant newspaper a "legitimate reason" to discharge a reporter such that it could not be found liable for wrongful discharge in contravention of public policy under West Virginia law. 915 F.Supp. 805, 812 (S.D.W.Va.1996)

**\*7** Second, Respondent asserts that though the ALJ found union animus to be the motivation behind all of Respondent's alleged unfair labor practices where such motivation was a necessary part of the violation, Respondent claimed and continues to claim that its true motive for a number of these actions was the disciplining of reporters for previously engaging in biased reporting in contravention of News–Press policy. Respondent argues that because these assertions relating to its motives create a factual dispute as to whether many of its actions against its employees related to the exercise of its editorial discretion, the issuing of various aspects of the requested injunction would risk violating its First Amendment rights. (Supp. Opp., at 8.) It is clearly established that the Board may inquire into the motives of a newspaper publisher for purposes of finding a violation of the NLRA and need not defer to the publisher's claims that its actions were motivated by reasons related to editorial control. The Supreme Court explicitly rejected any view to the contrary in *Associated Press,* stating that "[c]ourts deal with cases upon the basis of the facts disclosed, never with nonexistent and assumed circumstances." 301 U.S. at 132. The D.C. Circuit subsequently reiterated this view in *Passaic* and affirmed the Board's inquiry into, and ultimate rejection of, a newspaper's claimed anti-bias motives for its retaliatory actions against employees. 736 F.2d at 1556. In the instant action, the ALJ found where necessary that, despite Respondent's claims to the

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
(Cite as: 2008 WL 8628728 (C.D.Cal.))

contrary, Respondent's actions against employees were retaliation for union activity or support and not motivated by concerns about biased reporting. (Pet. Mem. Ex. 2, at 29–106.) These fact-intensive determinations are generally entitled to deference. *See, e.g., Silverman v. J.R.L. Food Corp.,* 196 F.3d 334, 337–38 (2d Cir.1999). Were the Court to find it highly unlikely that these findings would be over-turned by the Board, it could conclude that a grant of equitable relief did not significantly risk an in-fringement of Respondent's First Amendment rights in this respect. However, as the Court finds the en-tire requested injunction significantly risks in-fringing Respondent's First Amendment rights on the separate basis discussed immediately below, the Court will not explore this argument further.

Finally and most centrally, Respondent asserts that the union activity committed by the employees in this case was in large part directed at limiting Respondents' exercise of its editorial discretion. As such, Respondent argues that by preventing Re-spondent from disciplining employees engaged in such activity, the proposed injunction in its entirety infringes on Respondent's First Amendment right to maintain its editorial discretion. (Supp.Opp., 3–5.) In so arguing, Respondent takes the view that a newspaper has a First Amendment right to retaliate through discharges and other standard disciplinary tools against concerted or union activity demand-ing, in part, the ceding of that newspaper's First Amendment-protected editorial discretion. In Re-spondent's view, any such activity is rendered ef-fectively unprotected by the First Amendment and so cannot form the basis for a Section 8(a)(1) or (a)(3) violation.

**\*8** Before analyzing whether this argument is plausible, it is necessary to determine whether it has a proper factual basis. The Court finds that Re-spondent is correct in asserting that employees' Union-related activity had as a central demand the ceding of an aspect of Respondent's editorial dis-cretion. The ALJ opinion made note of the fact that, at a July 13th Union meeting, employees drafted a

letter delivered to Travis Armstrong, the editorial editor of the News–Press, which had four demands. The very first demand was:

> Restore journalism ethics to the Santa Barbara News–Press: implement and maintain a clear sep-aration between the opinion/business side of the paper and the newsgathering side.

(Pet. Ex. 2, at 41.) The employees requested a response within 72 hours to the demands in the let-ter. (*Id.*) These demands were repeated or displayed at Union-led demonstrations on five separate dates prior to the Union election. (*Id.,* at 41–43.) Spe-cifically, on July 20th, Marty Keegan, identified as the Union's lead organizer, read the demands at a Union demonstration and stated that the organizing employees would call for a customer boycott if these demands were not met. The organizing em-ployees ultimately did call for such a customer boy-cott and intermittently engaged in subsequent pub-lic organized activity in support of the Union throughout the period the alleged unfair labor prac-tices occurred. (*Id.,* at 15, 26–106.) The ALJ did not make any finding that the first demand relating to journalism ethics was ever retracted, as the ALJ did for the third of the original demands insisting that the News–Press invite back the newspaper em-ployees who previously resigned. (*Id.*) As such, the Court must conclude this was a demand of the Uni-on campaign backed by public organized activity putting economic pressure on Respondent before and at the time the alleged unfair labor practices oc-curred. Furthermore, in light of the fact that this was a central and oft-repeated demand of the Union campaign, the Court must assume, having not been presented any evidence to the contrary, that this continues to be a demand of the Union.

It is the Court's view that the above mentioned demand goes to the heart of Respondent's editorial discretion. In discussing this demand, the ALJ quoted the testimony of Melinda Burns, one of the discharged employees, who stated:

> To keep its credibility, a newsroom has to have

independence from the editorial side of the pa-per.... The editorial side is the opinion side. The publisher's opinion is in the editorials. The news side has to have the independence and freedom to report the news, gather the news ... and not to be pressured by the publisher to report it or gather it in a certain way.

(Pet. Ex. 2, at 51.) This quote makes clear what independently is fairly obvious to the Court: the separation of the opinion/business side of the paper and the newsgathering side is a demand related to content control falling within the publisher's editor-ial discretion. Therefore, it is the Court's view that Respondent's final First Amendment argument must be dealt with.

*9 The ALJ reached a different and, in the Court's consideration, erroneous view of this de-mand. The ALJ, on the basis of the testimony presented, determined as a general matter "that the union campaign was not part of an effort to let the reporters rather management [sic] control the con-tent of the newspaper." (Pet. Ex. 2, at 25.) The ALJ took the view that the Union campaign was only generally asking Respondent to "restore journalistic integrity" to the News–Press. (*Id.*, at 23.) The ALJ could envision demands discussed by the employ-ees that the Union could make, such as by-line pro-tection, that would restore journalistic integrity in the employees' view without interfering with Re-spondent's editorial discretion.[FN4] As such, the ALJ concluded that the Union campaign demands to restore journalistic integrity related to legitimate terms and conditions of employment of its reporters and did not pose a threat to Respondent's First Amendment rights, relying on *The Capital Times Co.*, 223 NLRB 651, 653 (1976), *overruled on oth-er grounds, Peerless Publications, Inc.*, 283 NLRB 334 (1987). (Pet. Ex. 2, at 51.) Therefore, the ALJ determined that the employees' Union activities were not rendered unprotected by any of the Union demands. (*Id.*) In making this determination, the ALJ did not acknowledge that the Union campaign was not simply making general demands to restore

journalistic integrity, but making a specific demand related to the content of the News–Press. Further-more, this demand was not a general exhortation to Respondent to act or a communication made by some of the organizing employees but in fact a central demand of the Union campaign continually backed from early on in its history by public demonstrations and a Union-organized customer boycott putting economic pressure on Respondent.[FN5]

> FN4. It should be noted the ALJ found the employees discussed seeking other meas-ures, in particular a pledge from the pub-lisher to not interfere with newsgathering and reporting. (Pet. Ex. 2, at 40–41.)

> FN5. Petitioner's citation to cases indicat-ing that as a general matter communica-tions made by employees during the course of otherwise protected activity are them-selves protected and cannot render the con-certed activity during which they occur un-protected are therefore inapposite. *See, e.g., Dries & Kump Mfg. Co. V. NLRB,* 544 F.2d 320, 329 (7th Cir.1976). (Pet. Supp. Resp., at 2–3.) These cases provide no guidance in the present case for the addi-tional reason that none involved commu-nications even potentially touching on an employer's First Amendment rights.

As noted above, the factual determinations of an administrative law judge are entitled to defer-ence. *See supra,* at 15. The Court is therefore loath to question any of the ALJ's factual determinations. Nonetheless, the Court must reject as clearly erro-neous the ALJ's view that the Union campaign was not, at least in part, aimed at forcing concessions from Respondent directly related to its exercise of editorial discretion. The ALJ's view on this point is contradicted by the ALJ's own specific findings with regard to the history of Union-related activit-ies at the News–Press.

With regard to the persuasiveness of Respond-

ent's argument arising from the Union campaign's demand relating to Respondent's editorial discretion, the Court, even following supplemental briefing, has not been offered any clear legal guidance by either party. *Tornillo* and *Passaic* do establish the general proposition that the NLRA may not circumscribe a newspaper's editorial discretion. However, the alleged First Amendment violation in the instant case is far different than those at issue in those cases. In both *Tornillo* and *Passaic,* the injunction at issue sought in some fashion to force publication of specific content by the newspapers at issue, thus actually directing the publishers' exercise of their editorial discretion. In this case, the injunction seeks to prevent Respondent only from disciplining its employees who engaged in activities aimed to pressure it into limiting its exercise of its editorial discretion. As such, the alleged infringement of Respondent's First Amendment rights is more indirect, and thus Respondent's claim of First Amendment protection is broader, in this case than in prior cases. Yet it is clear that the requested injunction does burden Respondent's exercise of its editorial discretion. Petitioner argues that the injunction does not pose a burden because Respondent is free not to bargain with employees on their stated demands. (Pet. Supp. Resp., at 5–6.) However, as already noted, these demands were not mere requests but were instead backed by public concerted activity placing economic pressure on Respondent to acquiesce. Respondent, were there no NLRA regime, would be able to retaliate for these actions through typical disciplinary means. By preventing Respondent from doing so, the sought after injunction amounts to state action limiting Respondent's ability to combat pressure placed on it to limit its exercise of editorial discretion. Again, this burden is indirect, but it is undeniably real.

**\*10** Though the Court finds the burden placed on Respondent's editorial discretion to be cognizable, it remains to be determined whether that burden potentially rises to the level of a First Amendment violation. Petitioner argues it does not. Peti-

tioner first urges the Court to heed the opinion of the ALJ, who found no potential First Amendment violation in Petitioner's application of the NLRA to Respondent. (Supp. Rep., at 2–4.) However, the Court does not find the ALJ's dismissal of Respondent's concerns well-founded. The ALJ held that even if the employees' concerted activity seeking to restore journalistic integrity could be viewed as somewhat infringing on Respondent's First Amendment rights, it was nonetheless protected under the reasoning of *Peerless Publications,* 231 NLRB 244 (1997), addressing a remand from the D.C. Circuit in *Newspaper Guild Local 10, v. NLRB,* 636 F.2d 550 (D.C.Cir.1980). (Pet. Ex. 2, at 52.) The decision in *Peerless* dealt with a situation in which employees sought to collectively bargain with a newspaper publisher with regard to the publisher's promulgation of a code of ethics and related work rules designed to protect the newspaper's editorial integrity. The code of ethics included standards for objectivity and accuracy in reporting, though primarily at issue were its provisions prohibiting the receiving of gifts by reporters that could create conflicts of interest. *Newspaper Guild,* 636 F.2d at 555. The publisher claimed such rules were not proper subjects of bargaining. The D.C. Circuit stated:

> [E]ditorial integrity of a newspaper lies at the core of publishing control. In a very real sense, that characteristic is to a newspaper or magazine what machinery is to a manufacturer. At least with respect to most news publications, credibility is central to their ultimate product and to the conduct of the enterprise. Moreover ... editorial control and the ability to shield that control from outside influences are within the First Amendment's zone of protection and therefore entitled to special consideration. In order to preserve these qualities, a news publication must be free to establish without interference, reasonable rules designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the publication for which they work as a medium of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
(Cite as: 2008 WL 8628728 (C.D.Cal.))

integrity.

636 F.2d at 560–61. However, the court also stated that "the degree of control which may be exercised by a publication in this regard is not open-ended, but must be narrowly tailored to the protection of the core purposes of the enterprise." *Id*. at 561 fn. 36. In light of this view, the D.C. Circuit ordered the Board to strike a balance in the case "between an employer's freedom to manage his business in areas involving the basic direction of the enterprise and the right of employees to bargain on subjects which affect the terms and conditions of their employment." *Id*. at 562. The D.C. Circuit noted that to strike this balance the Board would need to "distinguish between those provisions of the Code which, while central to the [newspaper's] interest in the preservation of its legitimate managerial prerogatives, affect the employees only minimally, and those which, although not essential to the publication's freedom to conduct its business, do have a significant impact on the employees." *Id*. at 561.

**\*11** On remand from the D.C. Circuit, the Board issued a ruling in line with its instructions. The Board initially stated:

We reaffirm the view that protection of the "editorial integrity of a newspaper lies at the core of publishing control," and that in order to preserve such, a news publication is free to establish reasonable rules designed to prevent its employees from engaging in activity which would "directly compromise their standing as responsible journalists and that of the publication for which they work as a medium of integrity," without necessarily being required to bargain initially. It follows from this privilege-which is directly incident to a newspaper's integrity-that the newspaper will be similarly exempt from mandatory bargaining about disciplinary action for employee breach of the basic rule.

283 NLRB at 335 (internal citations omitted). In order to balance the newspaper's right to protect

its editorial integrity with the employees' bargaining rights as required by the holding in *Newspaper Guild*, the Board declared a publisher could only promulgate and enforce a rule or code of conduct governing employee behavior without bargaining if the rule on its face was: "(1) narrowly tailored in terms of substance, to meet with particularity only the employer's legitimate and necessary objectives, without being overly broad, vague, or ambiguous; and (2) appropriately limited in its applicability to affected employees to accomplish the necessarily limited objectives." *Id*. at 335. The Board then proceeded to find the work rules and code of ethics at issue subject to bargaining in their entirety due to their over-breadth and frequent vagueness. *Id*. at 336.

The ALJ in the case at bar determined that as Respondent's rules related to reporter bias, "seen from the view of some employees, could be viewed vague [sic] and ambiguous" they were potentially proper subjects of bargaining and hence an appropriate target for employee concerted activity. (Pet. Ex. 2, at 52.) The Court views this determination as a misapplication of *Peerless* to the facts of the case. This case does not involve, as the ALJ erroneously found, a union request to generally bargain over the promulgation and enforcement of ethical and work rules related to reporter behavior and preparation of content. This case instead involves a specific demand by a union campaign regarding the publisher's preparation of content for its newspaper—i.e., the separation of the News–Press's news and editorial sections. *See supra*, at 16–19. Accordingly, the ALJ's analysis of the vagueness of Respondent's ethical rules relating to bias is not relevant to the legitimacy of the Union's activities. It is not in fact clear how the reasoning of *Newspaper Guild* and *Peerless* applies to the facts of this case at all. Furthermore, even if the Court were to accept the ALJ's view of the facts and of the applicability of *Newspaper Guild* and *Peerless* to those facts, the sensitivity of the inquiry mandated by *Newspaper Guild* and undertaken in *Peerless* would not allow the Court to find that there is no significant risk the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
(Cite as: 2008 WL 8628728 (C.D.Cal.))

ALJ's analysis will not be sustained. Therefore, the ALJ's wholesale dismissal under the reasoning of *Peerless* of Respondent's First Amendment concerns is not an adequate basis for concluding that a grant of equitable relief will result in no significant risk of a First Amendment violation.

**\*12** Petitioner in its final supplemental brief to the Court raised another, in the Court's view unpersuasive, argument premised on the holding in *Newspaper Guild*. Petitioner notes that nothing in the D.C. Circuit's analysis in that case "suggests that the union's demands were unlawful or that the employees' desire to bargain over issues related editorial control subjected them to discipline." (Pet. Supp. Resp., at 6.) This is true, but ultimately inconclusive, as the employer in that case was not found to have taken any retaliatory action against the union for activities placing economic pressure on the employer. Therefore, the court in *Newspaper Guild* was never required to deal with the constitutional issue of what freedom a newspaper possesses to combat union demands, backed by economic pressure, to bargain over subjects related to their editorial discretion.[FN6] Hence, the Court cannot draw the conclusion Petitioner desires from the holding in *Newspaper Guild*.

> FN6. It appears the union in *Newspaper Guild* did threaten a strike in an attempt to pressure the newspaper to bargain over its work rules at one point in the bargaining history, but the newspaper chose to respond in a non-confrontational manner by only nullifying its prior enforcement of the work rules. 636 F.2d at 554.

Petitioner finally urges the Court to reject Respondent's First Amendment claims because "there is no evidence that Respondent has taken any adverse employment action against an employee for" conduct related to journalistic integrity. (Pet. Mem., at 4 fn 3.) The ALJ did conclude that application of the NLRA in this case implicated no First Amendment rights for the additional reason that Respondent's disciplinary actions against organizing em-

ployees were not driven by a "genuine[ ] concern[ ] about the effort to restore journalistic intergrity [sic]." (Pet. Ex. 2, at 53.) The ALJ based this determination on the fact that many who supported the Union's efforts remained employed, which in the ALJ's view indicated that Respondent was truly concerned only with "ridding itself of prominent union supporters." (*Id*.) The thrust of this argument appears to be that even if the union activity at issue was partially directed at affecting the Respondent's editorial discretion, Respondent's disciplining of certain employees was not motivated by any desire to maintain its editorial control but instead merely by general animus toward the Union. As such, Respondent's disciplining of its employees was not related to any attempt to exercise or maintain its editorial prerogatives. The Court finds this analysis highly problematic as it rests on a false dichotomy. The Union was organized, in part, to affect Respondent's editorial discretion and undertook continual action to do so. It therefore does not seem possible to parse, at least in the manner the ALJ sought to do, Respondent's animus toward the Union generally from its desire to protect its editorial discretion. The motives necessarily overlapped in this case. As a result, the Court cannot view the ALJ's determinations in this regard as defeating Respondent's final First Amendment argument.[FN7]

> FN7. Petitioner's related argument that "Respondent never asserted that it: disciplined or discharged any employee for raising their concerns about journalistic integrity" is also unpersuasive. (Pet. Mem., at 4 fn 3.) Petitioner asserts that Respondent's stated reason for acting against certain employees engaged in Union-related activity was not because of the Union character of their activities but because of the "disloyal", "disruptive", or "defamatory" nature of their activities. (Pet. Mem., at 10 fn 9.) Hence, Petitioner argues, Respondent's actions against these employees was not motivated by any desire to protect itself from the Union and its demands re-

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
(Cite as: 2008 WL 8628728 (C.D.Cal.))

lated to editorial discretion, but instead merely to protect itself from disruption, defamation, or disloyalty. Whatever the persuasiveness of this distinction, it lacks factual support. Merely because Respondent raised the disruptive, disloyal, or defamatory nature of some employees' Union-related activity as justification for Respondent's actions against these employees, does not mean that this was in fact the Respondent's motive for its actions. In each of the instances cited by Petitioner in support of this argument the ALJ either made a specific finding that Union animus was the true motive for Respondent's actions or made no finding as to motive. (Pet. Ex. 2, at 63, 79, 89–90.) In either case, the Court lacks a basis to conclude definitively that animus toward the Union and its demands was not the motive for the Respondent's actions. As such, the Court cannot dismiss Respondent's First Amendment concerns as to any part of the injunction on this rationale.

In sum, the Court has not been provided any authority or argument by Petitioner that clearly forecloses Respondent's claim of First Amendment protection for all its alleged unfair labor practices. FN8 There is a tension in this case between the enforcement of the NLRA and the protections of the First Amendment that has not been specifically resolved by prior decisions. Respondent's argument as to the proper resolution of this tension seeks to extend or extrapolate from the reasoning of prior decisions to the facts at bar. Whether that argument will be accepted by the Board and any subsequent reviewing court or will be found to reach too far is irrelevant to the Court's determination. It is not the Court's role under Section 10(j) and *Overstreet* to attempt to resolve the First Amendment issues raised in this case, but only to ascertain whether these issues present a significant risk of a First Amendment violation arising from a grant of equitable relief. In the Court's view, Respondent's argu-

ment, while untested, is, like that at issue in *Overstreet,* legitimate and plausible. 409 F.3d at 1211. The Court is therefore compelled to determine that on the authorities presented there is a significant risk that the reasoning of *Tornillo* and *Passaic* could be extended to bar the requested injunction in its entirety. As such, under *Overstreet,* the Court must dispense with the usual deference afforded the Board's interpretation of the NLRA and require a particularly strong showing for a grant of equitable relief. 409 F.3d at 1208–10.

FN8. Petitioner argues the reasoning of *Hausch v. Donrey of Nevada,* 833 F.Supp. 822, 830 (D.Nev.1993), demonstrates why Respondent's First Amendment arguments lack substance. However, in *Hausch* the issue for the court was whether a newspaper had a First Amendment right to refuse promotion and ultimately discharge a managerial editor on the basis of sex in violation of Title VII. The court concluded it did not, stating:

Defendants have not alleged or demonstrated that there is any relationship between their ability to choose their Editor on the basis of sex, race, or any of the other characteristics prohibited by Title VII, and their ability to control the content and character of their newspaper's message. 833 F.Supp. at 832. Hence, *Hausch* only stands for the proposition, already laid down down in *Associated Press* and *Passaic,* that, without an argument as to their specific relationship to the exercise of its editorial discretion, a newspaper's personnel decisions with regard to editorial employees are not as a matter of course rendered free from regulation by the protections of the First Amendment. In the present case, Respondent is making a cognizable argument that its decisions to retaliate against employees for union

support did specifically relate to the exercise of its editorial discretion. Whatever the persuasiveness of that argument, the reasoning of *Hausch* does not in any way foreclose it.

D. *Likelihood of Success*

**\*13** The ALJ has found in favor of Petitioner on all relevant claims brought in the Complaint. (Pet. Ex. 2, at 57–106.) Respondent asserts that it has filed with the Board 227 exceptions of law to the ALJ's decision of which it discusses only five in its briefing to the Court. (Supp. Opp., at 15.) Petitioner states it intends to file a reply to each of these exceptions with the Board. (Supp. Rep., 6–7.) In light of the difficult First Amendment issues central to this case and improperly resolved by the ALJ, the Court as an initial matter certainly cannot find that Petitioner has such a strong likelihood of success as to presume irreparable harm. The Court will not further determine whether Petitioner can nonetheless show at least probable success or a fair chance of success on the merits. As the Court determines below that Petitioner has not made a sufficiently strong showing of irreparable harm or shown that the balance of hardships favor a grant of equitable relief, the requested injunction cannot be granted regardless of any showing by Petitioner of fair or even probable success on the merits.

E. *Irreparable Harm*

Petitioner asserts that a failure to grant the requested injunction will result in irreparable harm to the discharged employees and the Union's collective bargaining efforts. Petitioner asserts that the discharged employees, if not reinstated soon, will likely be forced to re-locate to seek new employment in order to support themselves and their families. (Pet. Mem., at 21.) Petitioner also offers employee testimony showing that the alleged unfair labor practices in this case have chilled employee support for the Union, as best evidenced by the sharp decline in regular attendance of Union meetings. (Pet. Mem., at 19; Pet. Ex. 3, at 6042, 6096.) Petitioner argues that without an interim order res-

cinding Respondent's retaliatory actions against Union supporters and specifically enjoining further such acts, the Union will continue to lose support and be "hamstrung in its efforts to negotiate an initial collective-bargaining agreement." (Pet. Mem., at 21.) Petitioner argues an interim order will restore support to the Union by reinstating the employees who formed the Union's core membership and reassuring current employees that unfair labor practices committed by Respondent will be timely remedied.[FN9] (Pet. Mem., at 20–24.) Preventing an employer from successfully defeating a union campaign through unfair labor practices clearly falls within the central remedial purposes of Section 10(j) and also strongly serves the public interest goals of the NLRA. *Miller,* 19 F.3d 459–60.

> FN9. Petitioner represents without supporting evidence in its briefing and through the declaration of attorney Steven Wyllie that seven of the eight discharged employees have sworn under oath they will accept interim reinstatement. (Supp. Rep., at 8; Wyllie Dec, 1–2.)

Respondent argues that Petitioner has made an insufficient showing of irreparable harm because over a year and a half has passed since the unfair labor practices have occurred. (Supp. Opp., at 24.) "Delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *Aguayo for and on Behalf of N.L.R.B. v. Tomco Carburetor Co.,* 853 F.2d 744, 750 (9th Cir.1988), *overruled on other grounds, Miller,* 19 F.3d at 458. In this case, the long delay likely means that the discharged employees have been already forced to secure other employment such that the payment of lost wages will to a large degree remedy any harm to them.[FN10] With regard to the harm to the Union's efforts, given the already severely reduced numbers of the Union, it is arguably the case that an interim order will not render the Union a strong presence at this time even if nearly all the discharged employ-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)
(Cite as: 2008 WL 8628728 (C.D.Cal.))

ees accepted reinstatement. It is also unclear that an interim order will banish any current chill on Union support. There is little basis to believe, given the long delay, that an interim order at this point will provide any genuine reassurance to employees beyond that provided by a final Board order that unfair labor practices committed by Respondent will be timely remedied. Therefore, there is reason to conclude that an interim order will not be significantly more effective than a Board order in remedying past harm and preventing future harm to the discharged employees or the Union's efforts. While under the typical *Miller* standard these concerns would likely not defeat Petitioner's showing of irreparable harm, they do weaken it sufficiently for the Court to find that Petitioner has not met the raised bar in this case.

> FN10. Petitioner, on whom the burden for showing irreparable harm rests, has provided no direct evidence in its briefing indicating the current employment status of the discharged employees. At hearing and through the declaration of attorney Wyllie, Petitioner represented that nearly all of the discharged employees had in fact already begun full or part time employment or studies with other organizations or found work as freelance writers and editors. (Wyllie Dec, at 1–2.)

### F. Balance of the Hardships/Serious Questions

**\*14** The Court also cannot conclude that Petitioner has shown that the balance of hardships tip sharply in favor of a grant of equitable relief in combination with the presence of serious questions going to the merits. The Court does not find that the balance of hardships tip sharply in Petitioner's favor. No evidence has been presented by either party as to the current structure of the News–Press or any re-hiring that has occurred. However, given the long period of time that has elapsed, it is reasonable to assume that the discharged employees have been replaced or the News–Press has re-structured. At hearing, Respondent made representations, albeit

unsupported by evidence, that both had occurred, which Petitioner did not fully contest.[FN11] The proposed injunction would likely force Respondent to let go of currently hired employees and re-organize. In addition, it would prevent Respondent from exercising what it continues to assert is its First Amendment right to combat Union efforts to limit its exercise of editorial discretion. As such, the proposed injunction would prove a fairly severe hardship on Respondent balancing the hardship that would be visited on the Union and discharged employees were equitable relief denied. Again, while such burdens on an employer would likely not defeat a showing for equitable relief under the typical *Miller* standard, *see Aguayo,* 853 F.2d at 750, the First Amendment issues raised by this case compel the Court to apply a higher bar and so consider these hardships to Respondent more seriously. Because of these hardships to Respondent, the Court cannot conclude that the balance of hardships tips sharply in favor of Petitioner. Therefore, Petitioner cannot make the requisite showing for receiving equitable relief on this alternate basis.

> FN11. Petitioner represents in its briefing without supporting evidence and noted at hearing that Petitioner has hired nine temporary employees who are currently performing bargaining unit work, including reporting, which Respondent contested at hearing. Petitioner argues that Respondent cannot claim any hardship from ending the assignments of these temporary employees in order to reinstate the discharged employees. (Supp. Rep., at 8.) As the burden of showing that the injunction is just and proper rests on Petitioner, the Court cannot rely on such an unsupported and contested allegation in granting Petitioner's requested injunction. Even if the Court did accept this allegation, it does not significantly affect the balance of hardships. Petitioner has made no allegation that the discharged employees' specific duties have been filled substantially, let alone totally, by the nine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

temporary employees. Hence, the Court cannot find that Respondent would only need to terminate the assignments of these temporary employees in order to reinstate the discharged employees.

**IV. Conclusion**

The Court is fully cognizant of the deference normally owed the Board and, to a lesser extent, the ALJ. However, the requested injunction in this case implicates First Amendment issues that the ALJ failed to adequately consider. Because of the presence of these First Amendment issues, which are not easily resolvable under the current state of the law, the Court must dispense with the usual deference owed the Board's interpretation of the NLRA and demand an unusually strong showing that a grant of equitable relief is just and proper under Section 10(j). As the Court does not find that Petitioner has made the requisite showing, the Petition is DENIED.

IT SO ORDERED.

C.D.Cal.,2008.
McDermott v. Ampersand Pub.L.L.C.
Not Reported in F.Supp.2d, 2008 WL 8628728 (C.D.Cal.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3173001 (N.D.Ill.)
**(Cite as: 2010 WL 3173001 (N.D.Ill.))**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. Illinois,
Eastern Division.
Jeffrey R. SCOTT, Plaintiff,
v.
Larry PETERSON, Defendant.

No. 09 C 1633.
Aug. 11, 2010.

Brian Keith Jackson, Craig Robert Annunziata, John Anton Berg, Fisher & Phillips LLP, Chicago, IL, for Plaintiff.

Jenie Van Hampton, Illinois Office of the Attorney General, Chicago, IL, for Defendants.

***MEMORANDUM OPINION AND ORDER***
VIRGINIA M. KENDALL, District Judge.

**\*1** Plaintiff Jeffrey R. Scott ("Scott") filed a two-count complaint against Defendants John Rita ("Rita") and Larry Peterson ("Peterson") (collectively "Defendants") alleging, pursuant to 42 U.S.C. §§ 1981 and 1983, that Defendants unlawfully terminated his employment because of his race. On March 17, 2010, the Court entered a default judgment against Peterson according to Federal Rule of Civil Procedure 55(a). A prove-up hearing of Scott's damages was held on May 26, 2010. The Court now awards damages of $245,475 for back pay and losses incurred for early IRA withdrawals, both including prejudgment interest, as well as for front pay. The Court also enters and continues Scott's Petition for Plaintiff's Attorneys' Fees, ordering Scott to submit additional evidence on or before August 30, 2010 showing the reasonableness of the specific rates charged for each of its attorneys and paralegals.

**BACKGROUND**

The following facts are taken from Scott's Second Amended Complaint and are deemed to be true for purposes of the default judgment against Peterson. *See Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.,* 722 F.2d 1319, 1323 (7th Cir.1983). Scott alleged that he was wrongfully terminated from his employment with the Illinois Youth Center Joliet ("IYCJ") because of racial discrimination. (Am.Compl.¶¶ 14, 18.) Scott, who is African-American, began work with the Illinois Department of Corrections in 1993 and was transferred to IYCJ in 1998. (Am.Compl.¶ 9.) Scott worked at the IYCJ until his termination in 2008. (Am.Compl.¶ 10.) During that time, Peterson was employed as a supervisor at the facility. (Am.Compl.¶ 21.) Over the course of Scott's employment at IYCJ, he received positive evaluations. (Am.Compl.¶ 11.) However, in June of 2006, IYCJ initiated an investigation into alleged misconduct by Scott. (Am.Compl.¶ 13.) At the conclusion of the investigation, IYCJ discharged Scott for violating IYCJ rules. (Am.Compl.¶ 14.) Similarly situated non-African-Americans violated the same or similar rules, but were not discharged for their misconduct. (Am.Compl.¶ 14.)

On March 17, 2010, the Court dismissed all claims against Rita pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* R. 65.) On the same date, the Court entered a default judgment against Peterson pursuant to Federal Rule of Civil Procedure 55(a) because Peterson had been properly served with the Second Amended Complaint but had failed to answer or otherwise plead in response to the claims against him. (*See id.*) A prove-up hearing was then held on May 26, 2010 in which Scott testified in support of the damages he has claimed. Scott requests compensation for $164,147 in back pay, $112,821 in front pay, $3,011 in penalties incurred for withdrawals from his IRA, $50,000 for pain and suffering, and $25,000 in punitive damages. (*See* R. 70, Information and Materials

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA Case #11-1348    Document #1363252    Filed: 03/12/2012    Page 115 of 124

Supporting Plaintiff Jeffrey Scott's Damages Prove-up ¶¶ 8-16) (hereinafter "Scott Supporting Materials.")

### DISCUSSION

*2 A default judgment establishes as a matter of law "that defendants [are] liable to plaintiff as to each cause of action alleged in the complaint." *Breuer Elec. Mfg. Co. v. Toronado Sys. of Am., Inc.,* 687 F.2d 182, 186 (7th Cir.1982). "Upon default, the well-pleaded allegations of a complaint relating to liability are taken as true." *Dundee,* 722 F.2d at 1323. However, while the allegations of the complaint relating to liability must be taken to be true, allegations regarding damages do not. *See id.* at 1323. When a default judgment has been entered, the plaintiff must adequately prove the amount of his damages. *See id.* "Even when a default judgment is warranted based on a party's failure to defend ... [t]he district court must ... conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *In re Catt,* 368 F.3d 789, 793 (7th Cir.2004) (citing *Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151 (2d Cir.1999)).

### I. Back Pay

At the May 26, 2010 prove-up hearing and in his related exhibits, Scott claimed $164,147 in back pay for the period from June 2006, when he was placed on suspension pending discharge, to March 17, 2010, the date on which the Court ruled on Peterson's default. (Scott Supporting Materials ¶ 8.) In both § 1981 and § 1983 cases, back pay is assumed to be appropriate in order to make the plaintiff whole. *See, e.g., Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290 (7th Cir.1987); *see also Barbour v. Merrill,* 48 F.3d 1270 (D.C.Cir.1995); *Coleman v. Lane,* 949 F.Supp. 604 (N.D.Ill.1996); *Mister v. Ill. Cent. Gulf R. Co.,* 790 F.Supp. 1411 (S.D.Ill.1992). Proper calculations of back pay represent the wages the plaintiff would have earned but for the adverse employment decision, less the amount of mitigating wages earned during that time. *See Waters v. Wis. Steel Works of Int'l Harvester Co.,* 502 F.2d 1309, 1321 (7th Cir.1974) ("[D]amages for the relevant period are to be determined by measuring the difference between plaintiff's actual earnings for the period and those which he would have earned absent the discrimination of defendants."). Prejudgment interest is also presumed to be appropriate in an award of back pay under § 1981 and § 1983, even if the employee has not requested it. *See Williamson,* 817 F.2d at 1298 ("Prejudgment interest therefore must be an ordinary part of any award for back pay ... under § 1981."); *DeLaCruz v. Pruitt,* 590 F.Supp. 1296 (N.D.Ind.1984) (prejudgment interest furthers the Congressional purpose underlying § 1983 and is necessary in order to make the wronged party whole).

Scott submitted IRS income transcripts establishing his wages for the years 2003 to 2005, while he was employed by IYCJ, and his wages for the period following his suspension and termination, from 2006 to March 17, 2010. Based on the average increase in earnings over his three years of documented wages with IYCJ, Scott used a five percent growth rate in his computations. (Scott Supporting Materials ¶ 14.) With that figure, Scott calculated his projected earnings from 2006 through March 17, 2010 with IYCJ by multiplying the previous year's projected earnings (or actual 2005 earnings in the case of the 2006 projection) by 1.05. From that projected figure, he subtracted his actual earnings for each year as reflected in the submitted IRS income transcripts to give his annual lost pay as a result of his termination from IYCJ. (See R. 70-9, Exhibit I, Plaintiff's Back Pay Calculation.) (hereinafter "Plaintiff's Back Pay Calculation"). The majority of these figures have been accurately calculated; however, in determining the back pay from January 1, 2010 through March 17, 2010, Scott mistakenly asserts that the period from January 1 to March 17 covers 3.5 months. However, January to mid-March represents approximately 2.5 months; the Court has therefore corrected this error in its calculation of Scott's back pay award.[FN1] While more data on annual wages with IYCJ for the

Slip Copy, 2010 WL 3173001 (N.D.Ill.)
(Cite as: 2010 WL 3173001 (N.D.Ill.))

years before 2003 would be preferable to more sub-stantially establish a realistic growth rate of Scott's wages, Scott has reasonably supported his claim for back pay by submitting the IRS transcripts and ac-companying calculations notwithstanding his minor accounting error. The Court therefore awards $158,044 in back pay.

> FN1. The Court accepts Scott's figures for 2006-2009 as presented in Plaintiff's Back Pay Calculation, but adjusts the 2010 fig-ure for the error regarding the time period between January and March. The "Prorated Projected 2010 Earnings" should equal $15,258-$73,240 projected annual earnings divided by twelve months, times 2.5 months. Subtracting mitigating wages of $9,859 gives $5,399 in back pay for 2010. This figure, added to Scott's claimed back pay for 2006-2009, gives total back pay of $158,044.

**\*3** While Scott has not requested prejudgment interest, such an award is appropriate in this case in order for the award to be fully compensatory. *See Williamson,* 817 F.2d at 1297. District courts are directed to "use the prime rate for fixing prejudg-ment interest where there is no statutory interest rate." *Gorenstein Enters., Inc. v. Quality Care-U.S.A., Inc.,* 874 F.2d 431, 436 (7th Cir.1989). Compound, rather than simple, interest is also prop-er. *See id.* Therefore, using the weighed average an-nual prime rate, compounding annually, Scott is awarded $14,468 in prejudgment interest on his back pay. FN2

> FN2. The annual interest rate used by the Court varied from 8.05% for 2007 to 3.25% for 2009 and 2010 based on a weighted average calculation using historic federal funds rate figures reported by the Federal Reserve. Federal Reserve Bank of New York, *Historical Changes to the Tar-get Federal Funds and Discount Rate: 1971 to Present,* http://www.newyor kfed.org/markets/statistics/dlyrates/fedrate.

html. First adding three points to the feder-al funds rate to give the prime rate, the Court then used the number of days per year that a given interest rate prevailed to calculate a weighted average annual prime rate. That rate was multiplied by the total back pay that had accrued to give the year's lost interest. The annual lost interest was then compounded on the last day of each calendar year, becoming part of the principle of accrued total back pay to which the next year's interest rate was ap-plied.

**II. Front Pay**

Scott also claims front pay for the period of March 18, 2010 to December 31, 2012 in the amount of $112,821. The goal of a front pay award is to put the victim in the financial position he would have enjoyed but for the wrongful employ-ment action, compensating him for the lost earnings from his former job for as long as he could be ex-pected to have held it. *See Barbour,* 48 F.3d at 1279; *see also Johnson v. Chapel Hill Indep. Sch. Dist.,* 853 F.2d 375, 382-83 (5th Cir.1988) (award of front pay appropriate equitable relief in a case involving Title VII, § 1981, and § 1983 violations). In § 1981 and § 1983 employment discrimination cases, in order to sufficiently show that he is en-titled to front pay, a plaintiff must present evidence that is not overly speculative and that establishes the award with reasonable certainty. *See Barbour,* 48 F.3d at 1279-80 (citing *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1372 (7th Cir.1992)); *Sagendorf-Teal v. County of Rensselaer,* 100 F.3d 270, 277 (2d Cir.1996) (award of front pay appro-priate in a § 1983 case when the court can reason-ably predict the plaintiff's prospects for future em-ployment). In calculating front pay, Scott uses sim-ilar methodology to that in his back pay accounting, employing a predicted five percent growth rate for both his IYCJ wages and his current wages, mul-tiplying his projected earnings from the previous year by 1.05 and then subtracting his estimated mit-igating wages from his projected earnings with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

IYCJ to give his projected annual loss for the remainder of 2010 and for 2011 and 2012. (R. 70-9, Exhibit I, Plaintiff's Front Pay Calculation) (hereinafter "Plaintiff's Front Pay Calculation"). Scott fails to explain why he requests front pay through 2012, but in order to provide complete relief, front pay may be awarded for a duration through which Scott could have reasonably been expected to remain employed with IYCJ. *See Barbour,* 48 F.3d at 1280 (considerations in determining length of front pay include the previous length of employment and probability of future employment with the defendant employer). Here, Scott's requested front pay would provide Scott with just under three additional years of relief. Given the length of his employment with the Illinois Department of Corrections and IYCJ and his positive evaluations prior to being terminated, the duration of Scott's request appears to be reasonable and is a short enough period that Scott's earning capacity or probability of continued employment during that time is not excessively speculative.

**\*4** While the period of requested front pay is appropriate, Scott's calculations of front pay include the same mistake regarding the January 1 to March 17 period as his calculations for back pay. (Plaintiff's Front Pay Calculation.) While that mistake was relatively minor in the calculation of back pay, it has resulted in an error of over $13,000 in Scott's estimated 2010 mitigating wages, upon which he then bases his 2011 and 2012 estimated mitigating wages.[FN3] The error in number of months between January and March also affected Scott's May 18, 2010 to December 31, 2010 projected IYCJ earnings.[FN4] This error only affects the projected IYCJ earnings for 2010; the 2011 and 2012 figures properly come from the 2010 annual projected figure of $73,240 to which a five percent growth rate was applied. (*See* Plaintiff's Front Pay Calculation.) Correcting these mistakes and subtracting the new mitigating wage figures from the projected IYCJ earnings, the Court reaches amounts of $20,518 in lost front pay from March 18, 2010 through December 31, 2010, $27,213 in lost front

pay for 2011, and $28,573 for 2012.

FN3. Scott's calculations suggest that the $9,859 he earned from January 1, 2010 through March 17, 2010 represent 3.5 months pay, implying that Scott was earning $2,817 per month, which, when annualized, would give Scott total 2010 wages of $33,804. (Plaintiff's Front Pay Calculation.) However, when the calculations are corrected so that the $9,859 represents only 2.5 months pay, the monthly and annual figures become $3,944 and $47,323, respectively. The corrected 2011 and 2012 wages, based on the $47,232 annual figure for 2010 would therefore be $49,594 for 2011 and $52,073 for 2012. Scott's projected mitigating wages from March 18, 2010 through December 31, 2010, a period of 9.5 months, equals $37,468.

FN4. Scott's projected annual 2010 pay with IYCJ was $73,240, or $6,103.33 per month. (*See* Plaintiff's Back Pay Calculation.) Scott deducts his incorrectly calculated projected earnings for January 1 through March 17 from the annual amount to give an incorrect figure for March 18 through December 31, 2010 that represents 8.5 months of pay rather than 9.5 months of pay. (*See* Plaintiff's Front Pay Calculation.) The correct projected earnings with IYCJ from March 18 through December 31 would be the $6,103.33 monthly wage, multiplied by 9.5 months for a total amount of $57,982.

In addition to his computational error, Scott also failed to discount his expected front pay to its present cash value. Front pay is designed to award the plaintiff the present value of the difference in earnings experienced as a result of termination. *See, e.g., Williamson,* 817 F.2d at 1297 (time value of money is taken into account by discounting lost future wages back to present value in explaining why prejudgment interest is not awarded on future earn-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3173001 (N.D.Ill.)
(Cite as: 2010 WL 3173001 (N.D.Ill.))

ings); *see also Wulf v. City of Wichita,* 883 F.2d 842, 855-56 (10th Cir.1989) (upholding an award of future pay discounted to present value). While it is typically the burden of the plaintiff to provide sufficient information for award calculation, including the appropriate discount rate, courts have discretion in resolving uncertainties when awarding damages. *See Barbour,* 48 F.3d at 1280; *see also Standley v. Chilhowee R-IV Sch. Dist.,* 5 F.3d 319, 322 (8th Cir.1993). Using the corrected figures for annual lost pay calculated by the Court and a discount rate of five percent,[FN5] the Court awards Scott a total of $69,557 in front pay, representing the present value as of March 18, 2010 of his lost future wages until the end of 2012.

> FN5. While choosing a discount rate for calculation of present value is by nature speculative, the Court has chosen five percent based on its above calculations of average prime rates from 2006 to 2010, where five percent represents an approximate average over the previous four-year period, and is a realistic, reasonably attainable rate of growth for the next two years.

### III. IRA Withdrawal Penalties

Scott has also provided testimony and documentation regarding IRA withdrawal penalties he incurred by having to withdraw funds from his IRA account in order to support himself after his termination. Account statements show that Scott paid $3,011 in taxes as a result of his withdrawals from 2007 to 2009. (*See* R. 70-10, Exhibit J.) Scott testified that these withdrawals were a direct result of his termination and lost wages because he needed to use the money in the account to pay his day-to-day living expenses. That testimony, along with the documentation in Exhibit J, sufficiently establishes that the $3,011 in withdrawal penalties were consequences of Scott's wrongful termination and are damages to which he is entitled. Prejudgment interest is also appropriate for the IRA withdrawal penalties. Using the same method employed in the calculation of prejudgment interest for back pay,

Scott is entitled to a total of $395 in prejudgment interest on his IRA withdrawal penalties.

### IV. Damages for Pain and Suffering

**\*5** Scott has also asked for compensatory damages for the pain and suffering he experienced as a result of his wrongful termination. At the prove-up hearing, Scott stated that he experienced humiliation and embarrassment, loss of personal relationships, and sleeplessness, among other emotional harms as a result of his termination from IYCJ. However, Scott provided no additional testimony in support of those claims. He had no medical bills, psychologist visits, or testimony of family or friends to corroborate his statements. Due to the lack of corroborating evidence, Scott has failed to prove his damages for emotional distress and pain and suffering with the reasonable certainty required.

Scott correctly notes that emotional damages may be established by the testimony of the plaintiff alone, and do not necessarily require support from medical records, experts, or other testimony. *See Tullis v. Townley Eng'g & Mfg. Co., Inc.,* 243 F.3d 1058 (7th Cir.2001); *Busche v. Burkee,* 649 F.2d 509, 519 n. 12 (7th Cir.1983) (absence of a medical expert is not fatal to claims for emotional injuries). However, credibility of evidence relating to damages is a factual determination to be made by the court, and a "plaintiff must prove the existence and magnitude of subjective injuries with competent evidence." *Busche,* 649 F.2d at 519 (internal quotation marks omitted); *see also Alston v. King,* 231 F.3d 383 (7th Cir.2000) (while a plaintiff's testimony in itself may be enough to establish emotional distress, he must still reasonably and sufficiently explain the circumstances of the injury rather than rely on mere conclusory statements).

Unsupported statements alleging humiliation and depression are insufficient to establish damages for emotional distress or pain and suffering. *See, e.g., Denius v. Dunlap,* 330 F.3d 919 (7th Cir.2003) ("bare allegations by a plaintiff that the defendant's conduct made him 'depressed,' 'humiliated,' or the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

USCA Case #11-1348    Document #1363252        Filed: 03/12/2012    Page 119 of 124
Slip Copy, 2010 WL 3173001 (N.D.Ill.)
(Cite as: 2010 WL 3173001 (N.D.Ill.))

like are not sufficient to establish injury [for pain and suffering in an § 1983 action] unless the facts underlying the case are so inherently degrading ... to infer that a person would suffer emotional distress...."); *Nekolny v. Painter,* 653 F.2d 1164, 1172-73 (7th Cir.1981) (finding insufficient evidence to support the jury award for damages for emotional distress when plaintiff only asserted that he was depressed, despondent and humiliated). So while a plaintiff's testimony alone *could* support an award of damages for pain and suffering, here it does not. Scott's vague statements about his humiliation, loss of relationships, and sleeplessness, without more, do not entitle him to any additional compensatory damages. The Court therefore denies Scott's request for damages for pain and suffering.

**V. Punitive Damages**

Scott has also requested that $25,000 in punitive damages be entered against Peterson. Punitive damages are appropriate when there has been a reckless disregard of an individual's rights or intentional violations of federal law. *See Merriweather v. Family Dollar Stores of Ind., Inc.,* 103 F.3d 576 (7th Cir.1996). In discrimination cases, an award of punitive damages requires a showing that the defendant acted "with malice or with reckless indifference to the federally protected right of the aggrieved individual." 42 U.S.C. § 1981(b)(1). In order to establish support for punitive damages, Scott must show more than simply that unlawful discrimination was the reason for the wrongful termination. *See Williamson,* 817 F.2d at 1296. Here, Scott has failed to show any specific actions by Peterson regarding Scott's termination, much less any evidence that shows that Peterson acted with malice or reckless indifference to Scott's rights. Because Scott has not proven that Peterson acted with malice or reckless indifference, he has failed to sufficiently support an award of punitive damages.

**\*6** In sum, therefore, Scott is not entitled to any award of punitive damages or damages for his alleged pain and suffering, but the Court awards a total of $245,475 for back pay, prejudgment interest

on back pay, the present value of lost front pay, losses incurred from early IRA withdrawal, and prejudgment interest on the IRA withdrawal penalties to be paid by Peterson.

**VI. Attorneys' Fees**

In addition to Scott's requests for the aforementioned damages, he has also filed a petition to recover attorneys' fees under 42 U.S.C. § 1988. Scott's attorneys have requested fees in the amount of $72,937.50 for the work of three attorneys-Craig Annunziata ("Annunziata"), who was appointed to represent Scott on March 31, 2009, Brian Jackson ("Jackson"), who filed his appearance on April 7, 2009, and John Berg ("Berg"), who filed his appearance on May 19, 2010. (*See* R.72, pp. 1-3.) Scott also requests fees for the work of paralegals Cynthia Muehling ("Muehling"); Dana Blumthal ("Blumthal"), and Heather Macdonald ("Macdonald"). (*See* R.72, pp. 1-3.) This fee total represents 23.4 hours of work by attorney Annunziata at a rate of $435 per hour; 14.1 hours of work by attorney Berg at a rate of $345 per hour; 177.6 hours by attorney Jackson at a rate of $315 per hour; and 3.7 hours, 5.5 hours, and 0.8 hours for Muehling, Blumthal, and MacDonald respectively, each at a rate of $195 per hour. (*See* R.72, Exhibit B.) Scott's attorneys have submitted a record of their hours worked, as well as affidavits of Annunziata, Berg, and Jackson certifying their job titles, billing rates, and statuses with the Illinois bar. (R.72, Exhibits C, D, E, and F.)

"In any action or proceeding to enforce a provision of [42 U.S.C. §§ 1981, 1983] the court, in its discretion may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...." 42 U.S.C. § 1988. While the court has discretion in awarding attorneys' fees, "fees should only be denied when special circumstances would render an award unjust." *Lenard v. Argento,* 699 F.2d 874, 899 (7th Cir.1983) (citing *Dawson v. Pastrick,* 600 F.2d 70, 79 (7th Cir.1979)). "Parties are 'prevailing' for § 1988 purposes 'if they succeed on any significant issue in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3173001 (N.D.Ill.)
(Cite as: 2010 WL 3173001 (N.D.Ill.))

litigation which achieves some of the benefit the parties sought in bringing suit.' " *Coleman v. Frierson,* 607 F.Supp. 1578, 1580 (N.D.Ill.1985) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). An award of attorneys' fees is appropriate in the event of default by the defendant as long as the plaintiff qualifies as a prevailing party. *See id.* (awarding attorneys' fees to plaintiff's counsel after the court entered a default judgment against defendant and then conducted a jury trial on the issue of damages); *see also Williams v. Z.D. Masonry Corp.,* No. 07 C 6207, 2009 WL 383614 (N.D.Ill. Feb.17, 2009) (Soat Brown, M.J.) (awarding adjusted attorneys' fees under § 1988 when plaintiff had earned a default judgment against defendant for Title VII and § 1981 claims). Attorneys' fees are also appropriately awarded even if plaintiff's counsel was originally appointed. *See Witherspoon v. Sielaff,* 507 F.Supp. 667 (N.D.Ill.1981). Here, because Scott prevailed in his awards of back and front pay as well as IRA withdrawal penalties as outlined above, he is entitled to reasonable attorneys' fees for his work in obtaining that result. *See, e.g., Turner v. Carothers,* No. 83-1166, 1986 WL 1433, at *1 (N.D.Ill. January 15, 1986) (Kocoras, J.) ("The plaintiffs ... brought and won on default, a civil rights action under 42 U.S.C. section 1983 against defendant ... As the prevailing parties in the action, the plaintiffs may recover 'a reasonable attorney's fee as part of the costs.' ").

**\*7** A reasonable fee should represent "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Coleman,* 607 F.Supp. at 1580 (citing *Hensley,* 461 U.S. at 433). In determining the appropriateness of this lodestar amount, the court may consider many factors, including the "novelty and difficulty of the questions involved, the amount involved and the results obtained, the customary fee and the experience and ability of the attorney." *Id.* The party requesting the fee has the burden of proving its reasonableness, including the hourly rate and appropriate hours expended. *See Hensley,* 461 U.S. at 437.

**A. Hourly Billing Rate**

A reasonable hourly billing rate reflects the prevailing market rate for similar types and qualities of legal work. *See Gautreaux v. Chi. Housing Auth.,* 491 F.3d 649, 660 (7th Cir.2007). "In determining the market rate, an attorney's actual billing rate for comparable work is presumptively appropriate to use as the market rate." *Mathur v. Bd. of Trustees of S. Ill. U.,* 317 F.3d 738, 743 (7th Cir.2003) (citing *Spegon v. Catholic Bishop of Chi.,* 175 F.3d 544, 555 (7th Cir.1999)). "An attorney's self-serving affidavit alone cannot establish the market rate for that attorney's services," however, but must be presented "in conjunction with other evidence of the rates charged by comparable lawyers" in order "to satisfy plaintiffs' burden." *Harper v. City of Chicago Heights,* 223 F.3d 593, 604 (7th Cir.2000) (citing *Spegon,* 175 F.3d at 555).

Here, Annunziata, Jackson, and Berg have each asserted in self-serving affidavits that the rates submitted in the request for fees are the rates that they charge; each also states that he exclusively practices employment and labor law, and certifies his time as a member of the Illinois bar. (*See* R. 72, Exhibits D-F.) By failing to provide any evidence of the rates charged by comparable lawyers in the area, Scott has not met the burden of showing reasonableness. *See, e.g., Harper,* 223 F.3d at 604 (district court did not abuse its discretion in accepted proposed hourly rates where the attorneys supported their rates with their own affidavits confirming their reasonableness and affidavits from other attorneys practicing in that market); *Markon v. Bd. of Educ. of the City of Chicago,* 525 F.Supp.2d 980, 982 (N.D.Ill.2007) (finding plaintiff's burden of showing reasonableness satisfied when plaintiff submitted not only counsel's affidavit and billing records but also affidavits by two other lawyers "attesting that Sweeney's reduced hourly rate of $285 per hour was reasonable"). Scott also does not present any material supporting the paralegals' hourly rate of $195, and recent cases have found reasonable paralegal billing rates ranging from $85 an hour to $175 an hour at the high end. *See Dupuy*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

USCA Case #11-1348    Document #1363252        Filed: 03/12/2012      Page 121 of 124
Slip Copy, 2010 WL 3173001 (N.D.Ill.)
(Cite as: 2010 WL 3173001 (N.D.Ill.))

*v. McEwen*, 648 F.Supp.2d 1007, 1017 (N.D.Ill.2009); *see also Riddle v. Nat'l Sec. Agency, Inc.*, No. 05 C 5880, 2010 WL 1655443 (N.D.Ill. Apr.23, 2010) (Soat Brown, M.J.) ($150 hourly rate for paralegals reasonable); *Sierra Club v. Franklin County Power of Illinois, LLC*, 05 C 4095, 2009 WL 3816816 at *8 (S.D.Ill. Nov.12, 2009) (Gilbert, J.) ($125 an hour paralegal fees reasonable); *Tillman v. New Line Cinema Corp.*, No. 05 C 910, 2008 WL5427744, *9 (N.D.Ill.Dec. 31, 2008) (Kennelly, J .) (paralegal rates up to $175 per hour are appropriate). The Court, therefore, orders Scott to submit additional evidence on or before August 30, 2010 of the reasonableness of the billing rates of its attorneys and paralegals. The Court next addresses the hours expended by the attorneys and paralegals, and will apply the billing rates to these hours when properly supported.

## B. Unrelated Work

**\*8** In evaluating the proposed number of billed hours in a request for attorneys' fees, courts consider the itemized time and accompanying descriptions of work relating to the case, checking for unrelated work on unsuccessful claims. *See, e.g., Lenard v. Argento*, 808 F.2d 1242, 1245 (7th Cir.1987); *Coleman*, 607 F.Supp. at 1580. Time spent pursuing claims that are not reasonably related to the plaintiff's successful claims should not be considered in an award of attorneys' fees. *Lenard*, 808 F.2d at 1245-46 (citing *Hensley*, 461 U.S. at 435). In order for a claim to be sufficiently related to a successful claim to allow it to be considered, the time spent must be "deemed to have been expended in pursuit of the ultimate result achieved." *See Hensley*, 461 U.S. at 435 (internal citation omitted).

Here, Scott's attorneys spent a significant amount of time researching and litigating claims against additional defendants, filing a Second Amended Complaint after the Court dismissed the first with respect to Rita for failure to state a claim and with respect to IDJJ on sovereign immunity grounds, and filing case-scheduling related motions. (*See* R. 40, R. 72, Exhibit C.) None of this work was performed in support of Scott's claims against Peterson, because Peterson never responded to any complaint filed by Scott. *See* R. 32, p. 2 (explaining, in the reply in support of Defendants' Rita's and IDJJ's motion to dismiss, that "Defendants' counsel has not yet filed an appearance on behalf of Peterson"); *see also* R. 40, p. 1 (explaining that only IDJJ and Rita moved to dismiss). Thus, the majority of the work included in Scott's fee petition was not related to the ultimate successful result of the claims against Peterson on default judgment. *See Lenard*, 808 F.2d at 1245. Indeed, this work resulted in a dismissal with prejudice of Scott's claims against both IDJJ and Rita.

The only work by Scott's attorneys that can be said to be related to the ultimate successful result of the case, then, was the time spent drafting the First Amended Complaint after being appointed, serving Peterson, and then preparing for and conducting the prove-up hearing. *See Hensley*, 461 U.S. at 435 (courts should look to whether the work can be "deemed to have been expended in pursuit of the ultimate result achieved"). The Court describes each attorney's time billed in one of these regards in turn.

### 1. Attorney Annunziata

Annunziata's only hours billed for one of these purposes occurred on 5/19/10, when he billed 4.1 hours preparing damage prove-up materials for filing and reviewing the materials in preparation for the hearing. (*See* R. 72, Exhibit C.)

### 2. Attorney Berg

Turning to Berg, his hours billed related to the prove-up hearing were: 4.1 hours on 5/19/10 preparing damage prove-up materials for filing and reviewing the file in preparation for hearing; .2 hours on 5/20/10 preparing direct examination outline for prove-up hearing; .8 hours on 5/24/10 preparing an outline for punitive damage and emotional distress sections of the direct examination of Scott; 2.1 hours on 5/25/10 reviewing and revising direct examination outline for Scott at the prove-up hearing;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

3.8 hours on 5/25/10 in an office conference with Scott and Jackson preparing for prove-up hearing; 1.2 hours on 5/26/10 preparing an outline for Scott's direct examination; .4 hours on 5/26/10 preparing Scott for prove-up testimony; and 1.3 hours on 5/26/10 conducting the proveup hearing in Court. (*See* R. 72, Exhibit C.) Berg's total number of appropriately billed hours was thus 13.9.

### 3. Attorney Jackson

**\*9** With respect to Jackson, his hours billed in filing the First Amended Complaint are as follows: 1.2 hours on 6/26/09 performing legal research for the Amended Complaint; 1.2 hours on 6/29/09 drafting the Amended Complaint and reviewing cases regarding Amended Complaint claim; 4.2 hours on 6/30/09 researching Section 1981, Section 1983, and equal rights claims, and drafting the Amended Complaint; 4.2 hours on 7/1/09 drafting the Amended Complaint; 1.6 hours on 7/2/09 calling and emailing Scott regarding the Amended Complaint and editing the Amended Complaint; and 2.8 hours on 7/6/09 calling the Illinois Attorney General's office regarding the Amended Complaint, editing it and emailing Scott regarding it. (*See* R. 72, Exhibit C.) His total number of hours spent on the Amended Complaint was 15.2.

Jackson then billed 10.8 hours related to effectuating service of Peterson. Those hours were as follows: .8 hours on 9/2/09 drafting an email to Scott about Peterson's whereabouts; .3 hours on 9/9/09 emailing with opposing counsel about Peterson's whereabouts; .3 hours on 9/11/09 calling Scott regarding Peterson's whereabouts; 1.3 hours on 9/14/09 calling opposing counsel again about Peterson and reviewing the federal rules on issuing a summons; 1.1 hours on 9/16/09 editing a rider to the subpoena for Peterson's address, calling opposing counsel regarding it, and reviewing online information about Peterson's last known address; 1.6 hours on 9/17/09 calling Scott regarding Peterson's whereabouts and calling opposing counsel regarding service of Peterson; .8 hours on 9/21/09 calling Scott regarding Peterson; .3 hours on 9/23/09

emailing a J. VanHaughten regarding service of Peterson; 1.2 hours on 9/29/09 reviewing the documents produced in response to the subpoena for Peterson's address and emailing opposing counsel about it; 1.3 hours on 10/6/09 discussing the private investigator's service of the summons with paralegal Blumthal and reviewing federal and local rules about Peterson's attempt to evade the Court's jurisdiction; and 1.8 hours on 10/7/09 calling Jack King regarding service of Peterson, drawing an affidavit of Jack King, and reviewing the rules regarding service of summons. (*See* R. 72, Exhibit C.)

Finally, Peterson billed 32.4 hours in connection with the prove-up hearing. Specifically, he billed. 8 hours on 3/31/10 reviewing the Court's order regarding "prove up" documents and calling and emailing opposing counsel regarding the state's potential representation of Peterson; 1.2 hours on 4/2/10 reviewing documents related to damages and drafting a letter identifying outstanding documents; 2.6 hours on 4/1 /10 researching sufficient prove-up evidence and framework for a proveup; 1.2 hours on 5/3/10 reviewing Scott's documents regarding damages and reviewing case law regarding documents to support prove-up damages; .7 hours on 5/7/10 preparing a prove-up pleading; 3.8 hours on 5/10/10 performing research on damages allowable under Sections 1981 and 1983 and drafting prove-up; 1.1 hours drafting prove-up documents on 5/11/10; 1.6 hours on 5/13/10 researching availability of retirement benefits as damages; 2.8 hours on 5/17/10 researching Section 1981 and Section 1983 claim in relation to damages for pain and suffering and emotional distress and drafting prove-up documents; 2.8 hours on 5/18/10 researching Illinois employee indemnification law and drafting prove-up documents; 5.2 hours on 5/19/10 drafting damage calculations and prove-up documents; 1.2 hours on 5/20/10 drafting direct examination for Scott; 1.4 hours on 5/24/10 continuing to draft the direct examination; 3.2 hours on 5/25/10 preparing Scott to testify and drafting his direct examination; and 2.8 hours on 5/26/10 preparing Scott and conduct-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3173001 (N.D.Ill.)
(Cite as: 2010 WL 3173001 (N.D.Ill.))

ing the prove-up hearing. (*See* R. 72, Exhibit C.) Jackson thus expended a total of 58.4 hours on the Amended Complaint, effectuating service, and the successful portions of the prove-up.

### 4. Paralegals

**\*10** The paralegals' relevant billings included .4 hours by Muehling on 10/30/09 electronically filing service returned executed as to Peterson and confirming whether a notice of filing was required and .2 hours by Macdonald on 5/20/10 hand delivering courtesy copies of the damages prove-up to the Court. (*See* R. 72, Exhibit C.) Paralegal Blumthal also billed: .6 hours on 7/6/09 filing the First Amended Complaint with this Court; .7 hours on 9/16/09 and 1.1 hours on 9/17/09 researching Peterson's current contact information; .2 hours on 9/24/09 calling process server Jack King regarding serving Peterson; .6 hours on 9/25/09 drafting a summons for Peterson; .7 hours on 9/25/09 drafting a letter to the process server with a summons and delivering it to his office; .7 hours on 10/2/09 drafting a new summons for Peterson; and .4 hours on 10/6/09 calling Jack King regarding serving of an alias summons. (*See* R. 72, Exhibit C.) That brings the paralegals' billing total to 5.6 hours.

### C. Degree of Success and Other Factors

In addition to considering time not related to the ultimate successful outcome in a case, other factors relevant to the Court's determination include the novelty or complexity of the questions involved and the experience, reputation, and ability of the attorneys. *See Lynch v. City of Milwaukee,* 747 F.2d 423, 426 (7th Cir.1984) (citing *Hensley,* 461 U.S. at 430). Here, Scott's case was a relatively simple employment civil rights case with straightforward facts and clear legal theories. The case did not go to trial, but was decided by default, involving only one, short prove-up hearing at which only Scott testified. Moreover, the affidavits of each attorney establish their exclusive experience in labor and employment matters and the lengths of time for which they have been licensed, showing substantial experience and indicating ability in this area of the

law that should have lessened the time required to litigate this case. (*See* R. 72, Exhibits D, E, F.)

The Court also considers the overall reasonableness of the requested fee, analyzing the "relationship between the extent of success and the amount of the fee award." *See Farrar,* 506 U.S. at 115-16 (citing *Hensley,* 461 U.S. at 438). If "a plaintiff has achieved only partial or limited success, [the reasonable lodestar amount] may be an excessive amount. This will be true even where a plaintiff's claims were interrelated ...." *Hensley,* 461 U.S. at 436. The Court may then reduce the overall award amount to reflect the Plaintiffs' degree of success. *See id.* Here, Scott's overall success on his claims was limited, with all of his claims being dismissed with prejudice except with respect to Peterson who defaulted. Indeed, the default in this case was not even granted upon Scott's motion-the Court entered default *sua sponte* based on Peterson's failure to answer.

For each of these reasons, the Court in its discretion finds the total number of hours-76.4 hours of attorney time and 5.6 of paralegal time-billed on filing a standard Amended Complaint, serving Peterson, and conducting a straightforward prove-up excessive, and reduces the lodestar by fifty percent. *See Libby by Libby v. Ill. High School Ass'n,* 921 F.2d 96, 98 (7th Cir.1990) ("An attorneys' fees award pursuant to § 1988 rests within the sound discretion of the district court because that court is particularly well-qualified to make the partially subjective findings necessary for an award of fees and to perform the balancing of equities that is an integral part of the proceeding for an award of fees."); *see also Hensley,* 461 U.S. at 435 ("[T]he district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."). Thus, when Scott introduces proper support for the billing rates, the Court will divide the total amount of the fee award for each attorney and paralegal by half.

### D. Prejudgment Interest

USCA Case #11-1348    Document #1363252    Filed: 03/12/2012    Page 124 of 124

Slip Copy, 2010 WL 3173001 (N.D.Ill.)
**(Cite as: 2010 WL 3173001 (N.D.Ill.))**

**\*11** Prejudgment interest may also be considered in an award for attorneys' fees, and may be included at the discretion of the court if necessary in order to make the award fully compensatory. *Shott v. Rush-Presbyterian St. Luke's Medical Ctr.,* 338 F.3d 736 (7th Cir.2003). In most federal cases, including those under § 1988, prejudgment interest is presumptively appropriate. *See id.* at 744-45. However, prejudgment interest or other award adjustments are ultimately at the court's discretion, and when considered under § 1988, are often awarded in order to compensate the attorneys for an unreasonable or unexpected delay in payment. *See Missouri v. Jenkins by Agyei,* 491 U.S. 274, 284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *see, e.g., Owner-Operator Indep. Drivers' Assoc. Inc. v. Mayflower Transit, Inc. .,* 659 F.Supp.2d 1016 (S.D.Ind.2009). Unlike in *Missouri or Shott,* where adjustments for § 1988 awards to account for time that had passed without payment were found to be appropriate, in this case, there has been no delay after the entry of default to interfere with the payment of counsel. Scott's counsel was originally appointed, and without the award of attorneys' fees, there likely would be no payment to the attorneys, much less prompt, periodic payment during the year that the attorneys worked on Scott's case. If payment was not delayed or even expected, there is no need for an award of compensating interest. Therefore, the award of attorneys' fees is sufficient to fully compensate Scott's attorneys, who were not expecting payment throughout the duration of their work on the case, and prejudgment interest on the award of attorneys' fees is unnecessary.

### CONCLUSION

The Court grants Scott a total of $245,475 for back pay, lost IRA withdrawal penalties, prejudgment interest, and front pay discounted to present value at March 18, 2010, but does not award any damages for emotional distress, pain and suffering, or other punitive damages. The Court also enters and continues Scott's Petition for Plaintiff's Attorneys' Fees, ordering Scott to submit additional evidence on or before August 30, 2010 showing the reasonableness of the specific rates charged for each of its attorneys and paralegals. Once such evidence is submitted, the Court will apply the reasonable billing rates to the fee petition as outlined above.

N.D.Ill.,2010.
Scott v. Peterson
Slip Copy, 2010 WL 3173001 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.